Bernard Lee HAMILTON,
Petitioner–Appellant,

v.

Daniel VASQUEZ, Warden of San Quentin; The Attorney General of the State of California, Respondents–Appellees.

Nos. 91–56251, 91–56252, 91–56295, 91–56403, 91–80385 and 93–55039.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 15, 1992.

Decided Feb. 3, 1994.

As Amended on Denial of Rehearing; Suggestion for Rehearing En Banc Rejected March 22, 1994.

Peter H. Benzian, Latham & Watkins, San Diego, California and Richard C. Camino, Tustin, California, for the petitioner-appellant.

Pat Zaharopoulos, Assistant Attorney General, San Diego, California, for the respondents-appellees.

Before: SCHROEDER, FLETCHER and TROTT, Circuit Judges.

SCHROEDER, Circuit Judge:

Bernard Hamilton, a California state prisoner sentenced to death, appeals the district court's denial of his 28 U.S.C. § 2254 habeas petition. The case arises from Hamilton's conviction in San Diego County Superior Court for first degree murder, burglary, robbery and kidnapping in violation of Cal.Penal Code §§ 187, 459, 211, 207, and his sentence

to death. He also appeals from the denial of his Rule 60(b) motion asking the district court to consider, as part of his original petition for habeas relief, claims that he had failed to exhaust during the pendency of the habeas petition. We affirm the district court's denial of the Rule 60(b) motion and the denial of relief on the merits on those claims going to the validity of the underlying convictions. We hold that Hamilton is entitled to relief only with respect to the penalty phase of the state court proceedings, because on the basis of the confusing instruction given, the jury could not have made a reasoned and informed choice between a death sentence and a life sentence without possibility of parole.

The factual circumstances of this case are set out at length in *People v. Hamilton*, 41 Cal.3d 408, 221 Cal.Rptr. 902, 710 P.2d 981 (1985), *vacated, California v. Hamilton*, 478 U.S. 1017, 106 S.Ct. 3328, 92 L.Ed.2d 734 (1986) (*Hamilton I* ), and *People v. Hamilton*, 45 Cal.3d 351, 247 Cal.Rptr. 31, 753 P.2d 1109 (1988), *cert. denied*, 488 U.S. 1047, 109 S.Ct. 879, 102 L.Ed.2d 1002 (1989) (*Hamilton II* ). Hamilton's convictions arise from the death of Eleanore Frances Buchanan. Mrs. Buchanan's body was discovered near San Diego, California, on May 31, 1979. The body's head and hands were missing. Two strings of white cord were tied to her ankles, blue fibers were stuck to her body and tie marks were present on her wrists. There were stab marks in her abdomen and evidence showed that her head and hands were removed by use of both a knife and a saw.

On the day of her disappearance, Mrs. Buchanan left her home driving the family's blue van in order to attend class at Mesa College. Her husband testified that she was wearing tan Levis, a brown and beige shirt, and carrying a brown purse. Mrs. Buchanan attended class and was last seen alive at about 9:30 p.m. as she walked toward the school parking lot.

Bernard Hamilton was stopped while traveling in a blue van in Oklahoma on June 8, 1979. When the police checked the vehicle identification number, they learned that the van belonged to Mrs. Buchanan. Hamilton was arrested. During the preceding week, Hamilton had used the Buchanans' credit cards to buy food, gas and other items, including a saw, a screwdriver and a set of wrenches, a butcher knife and twine. Blood on the floor of the van and blood on Hamilton's shoe matched the blood type of the victim.

San Diego police interviewed Hamilton in Oklahoma on the day after his arrest. Hamilton waived his *Miranda* rights and told the police that he had traveled from San Diego with "Fran" (Mrs. Buchanan's nickname) and "Spider," Calvin Spencer. He said that Mrs. Buchanan had left her husband for Spider, and that the two departed for Louisiana, leaving Hamilton with the van and credit cards. Hamilton identified Mrs. Buchanan from a picture and stated that when he saw her she was wearing "light colored jeans and carrying a beige non-leather purse."

At trial, the prosecution presented evidence that Hamilton had called Donna Hatch in Terrell, Texas on May 31, 1979 from his parents' home in San Diego. He told Hatch that he would leave for Texas in a van when the gas station opened in the morning. Hamilton used the Buchanans' credit card to buy gas between 4:45 a.m. and 10:15 a.m. on May 31, 1979. He also bought gas later in the day in El Centro, California and in Tucson, Arizona. Hamilton arrived in Terrell on June 1. Hatch's testimony was that when the van arrived, it was dirty, and the arm of the driver's chair, the mirror and the window on the passenger side were broken. Hatch stated that she saw credit cards in the names of Terry and Eleanore Buchanan in the van. Hatch also testified that she heard Hamilton call his brother and tell him that he had flown to Texas. Hamilton told Donna that he "thought he had killed a man but he did not want to tell her any details because she might not want to have anything to do with him if he told her." *Hamilton I*, 221 Cal. Rptr. at 905, 710 P.2d at 984.

At trial an inmate at the San Diego jail, Steven Thomas, testified that he had spoken with Hamilton, who said "well I did it but they'll never prove it." *Id.* at 906, 710 P.2d at 985. When Hamilton was transported to the courtroom on August 21, 1979, he apparently told Sheriff Parsons: "alright, you have

your fun, I'll have mine later." The Deputy responded, "I thought you already had your fun." Hamilton responded, "Yea, and I'll kill a lot more, too, and you may be first on my list." *Id.* at 906, 710 P.2d at 985.

Hamilton testified at trial that he had never seen the victim. He stated that he found the van parked on a street between 12:45 and 1:00 a.m. on May 31. The keys were in the ignition and he drove the van home, called Hatch and left for Texas later that morning. He testified that he invented the story about spending time with Spider and Fran so that he would not be charged with theft of the van. He denied the threats to Donna Hatch. He explained that he bought the saw and other knives in order to rob a store in Texas.

Hamilton was convicted of first degree murder, burglary, robbery and kidnapping. He was sentenced to death on March 2, 1981. The California Supreme Court, on appeal, affirmed the conviction as to Hamilton's guilt but reversed his death sentence. *See People v. Hamilton,* 41 Cal.3d 408, 221 Cal.Rptr. 902, 710 P.2d 981 (1985). In upholding the conviction, the court ruled that there was no error in the trial court's denial of Hamilton's motion to proceed in pro per. The court also upheld the trial court's decision to shackle Hamilton during trial. The court agreed with Hamilton that it was error to allow into evidence letters that he had written while in jail on an earlier conviction. *Id.,* 221 Cal. Rptr. at 913, 710 P.2d at 992. However, the court ruled that the evidence was not prejudicial, and refused to overturn the conviction. The court upheld the admission into evidence of another letter, written by Hamilton to Theresa Roch, which threatened the defense attorney, prosecutor and witnesses in his murder trial. The court upheld the admission of Hamilton's statement to Sheriff Parsons. It also affirmed the admission into evidence of the saw, knife and twine that Hamilton purchased. The court ruled that any error in the admission of Steven Thomas's testimony was harmless beyond a reasonable doubt.

With respect to his death sentence, Hamilton argued that the special circumstance finding should be set aside and the death penalty reversed due to error under *Carlos v. Superior Court,* 35 Cal.3d 131, 197 Cal. Rptr. 79, 672 P.2d 862 (1983), because the court did not instruct the jury on the necessity for intent to kill in the felony-murder special circumstance. The Supreme Court agreed, and set aside the finding of the special circumstance, reversed the death penalty but affirmed on all other grounds.

*Hamilton I* was vacated by the Supreme Court, *California v. Hamilton,* 478 U.S. 1017, 106 S.Ct. 3328, 92 L.Ed.2d 734 (1986), for consideration in light of *Rose v. Clark,* 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986). On remand, in *Hamilton II,* the California Supreme Court upheld the special circumstance finding and the sentence of death. *People v. Hamilton,* 45 Cal.3d 351, 247 Cal.Rptr. 31, 753 P.2d 1109 (1988), *cert. denied,* 488 U.S. 1047, 109 S.Ct. 879, 102 L.Ed.2d 1002 (1989).

Hamilton thereafter filed a petition in district court, pro se, setting forth exhausted claims. Hamilton contended that shackling his hands and legs at trial was unconstitutional (1 CR 1). The district court dismissed the petition without reviewing the state court record. On appeal, this court reversed the judgment of the district court and remanded the case, instructing the district court to examine the entire trial court record and conduct an evidentiary hearing if necessary. *Hamilton v. Vasquez,* 882 F.2d 1469, 1473 (9th Cir.1989). We also directed the appointment of counsel.

Hamilton filed three more petitions, two of which were dismissed, and one of which was consolidated with the pending petition (SER 8; ER 210). On March 6, 1990, the district court ordered Hamilton to identify, within 90 days, all additional claims to be raised on habeas corpus (ER 207–08). Hamilton identified 38 claims, the majority of which were unexhausted (*id.* at 245–256). On June 21, 1990, following Judge Alarcon's concurring opinion in *Neuschafer v. Whitley,* 860 F.2d 1470, 1482 (9th Cir.1988), *cert. denied,* 493 U.S. 906, 110 S.Ct. 264, 107 L.Ed.2d 214 (1989) (Alarcon, J., concurring), the district court ordered Hamilton to file all the unexhausted claims in state court, or amend the petition to contain only exhausted claims, by August 8, 1990 (*id.* at 211). On September

18, 1990, the district court extended the time for Hamilton to exhaust state remedies until October 22, 1990 (*id.* at 212–14). In addition, the district court ordered that any claims that had not been filed in state court or any exhausted claims not raised in federal court by that date would be considered waived (*id.*).

Hamilton filed an amended consolidated petition in the district court on October 22, 1990, the denial of which is the basis of the present appeal to this court (2 CR 48). This petition superseded the pending consolidated petitions (*id.*). He had not filed any unexhausted claims with the state court, and all claims raised in the petition had been exhausted (ER 119). The district court, on November 21, 1990, ordered that all claims not included in the amended petition were deemed waived (*id.* at 215(b)). The district court then conducted a three-week evidentiary hearing (I–X EH). At the end of the evidentiary hearing, the district court denied Hamilton's motion to stay the proceedings in order to present new evidence (ER 216–22).

On August 23, 1991, the district court denied the petition (*id.* at 114–206). The district court granted a certificate of probable cause to appeal on November 13, 1991 (*id.* at 229–30). Hamilton timely appealed (*id.* at 44). Hamilton then filed in the district court a Fed.R.Civ.P. 60(b) motion for relief from the judgment and for leave to amend the habeas corpus petition. The district court denied the motion on September 28, 1992 (13 CR 210). Hamilton timely filed a notice of appeal from the denial of the Rule 60(b) motion on October 26, 1992 (13 CR 210).

Accordingly, we have before us three sets of issues: those relating to the validity of the underlying conviction; those relating to the penalty phase of the state proceedings; and those relating to the denial of the Rule 60(b) motion.

## I. *Challenges to the Underlying Convictions*

### A. *Shackling*

■ Hamilton contends that the trial court's decision to shackle him during his state criminal trial violated due process.

When this matter was before us earlier, we directed that the district court review the state court record and conduct an evidentiary hearing if necessary to determine the merits of this claim. We observed that "[i]ndependent review of the state court record is often vital in habeas petitions, but particularly so in petitions challenging a decision to shackle the defendant through his criminal trial. Shackling is strongly disfavored because of the danger that it may deprive the defendant of the presumption of innocence." *Hamilton v. Vasquez*, 882 F.2d at 1471. Citing *Wilson v. McCarthy*, 770 F.2d 1482, 1485 (9th Cir. 1985), we further observed that shackling is proper "where there is a serious threat of escape or danger to those in and around the courtroom or where disruption in the courtroom is likely if defendant is not restrained." *Id.*

Upon remand, the district court conducted a thorough review of the state court record and held an evidentiary hearing which included testimony from Hamilton's former counsel, the trial court judge and Hamilton himself. The district court made detailed findings concerning the circumstances surrounding the shackling and the basis for the trial court's decision.

Those findings reflect that Hamilton was originally placed in restraints prior to trial at the request of his counsel. The request was based upon Hamilton's sexual assault on counsel's assistant, and a physical assault on counsel himself. At Hamilton's request, the shackles were removed, and the trial began with Hamilton in a restrictive leg brace under his trousers. At that point, the district court found that Hamilton was on notice that future shackling depended upon Hamilton's conduct both in and out of court.

The leg iron was subsequently removed after Hamilton complained of pain. The trial court inquired about the availability of other types of restraints and concluded that Hamilton should have a chance to start trial without restraints.

The episode which gave rise to further restraint was a verbal assault and violent behavior exhibited toward deputies who were to bring Hamilton from his cell to the court-

house on the third day after jury selection commenced. After a hearing that morning, the trial court found a pattern of increased agitation on the part of Hamilton and was concerned that he was "on the edge of losing control of himself at any time." The court considered and rejected increasing the number of bailiffs because of their inability to control a sudden outburst. The court also considered removing Hamilton from the courtroom during trial but rejected this alternative because of Hamilton's status as co-counsel. The court ordered Hamilton shackled for trial "with no alternative available."

Hamilton was then placed in handcuffs attached to a chain around his waist. He had a chain placed around his legs. Although Hamilton was seated during trial, the jury was aware of the shackles because he took the stand to testify.

On the basis of these findings, which are fully supported by the evidence, the district court concluded that the trial court had taken all of the requisite steps to safeguard Hamilton's rights. These included determining on the basis of adequate inquiry that an unusual measure was necessary to preserve security, pursuing less restrictive alternatives, and warning the defendant that disruptive behavior might result in physical restraints. *See Illinois v. Allen*, 397 U.S. 337, 344, 90 S.Ct. 1057, 1061, 25 L.Ed.2d 353 (1970); *Jones v. Meyer*, 899 F.2d 883, 885 (9th Cir.), *cert. denied*, 498 U.S. 832, 111 S.Ct. 95, 112 L.Ed.2d 67 (1990); *Spain v. Rushen*, 883 F.2d 712, 721 (9th Cir.1989), *cert. denied*, 495 U.S. 910, 110 S.Ct. 1937, 109 L.Ed.2d 300 (1990); *Tyars v. Finner*, 709 F.2d 1274, 1284–85 (9th Cir.1983). The district court concluded that the shackling did not violate Hamilton's right to due process.

On appeal, Hamilton contends that the facts before the trial judge did not justify shackling. The record as more fully developed in the district court's evidentiary hearing belies this contention. Hamilton's behavior outside of court and demeanor in court supported the determination that shackling was justified. The record similarly belies the contention that the trial court failed to consider a less restrictive alternative than

shackles. Less restrictive alternatives were attempted but failed.

Hamilton contends that he was not properly warned that he might be placed in shackles, but this contention is without merit. Although he was not expressly warned that he would be placed in shackles, the district court found that he was on notice that further disruptive behavior might lead the court to order shackles. This finding is fully supported by the record which shows that Hamilton was shackled only after he himself complained of pain from the leg brace and expressed his own preference for shackles to the brace.

■ Finally, Hamilton contends that the district court improperly allowed the trial judge to testify at the evidentiary hearing. This court, in remanding Hamilton's case, instructed the district court to hold an evidentiary hearing if it deemed such a hearing appropriate to supplement the state court record. *Hamilton*, 882 F.2d at 1473. Cal. Evid.Code § 703.5 bars a judge from testifying at subsequent civil proceedings as an expert about matters before him in his judicial capacity, but it does not preclude a judge from testifying as a fact witness in a habeas proceeding. There is no basis for holding that California state law, much less federal law, was violated by the district court's hearing this testimony. There is, in sum, no basis to overturn the district court's conclusion that the shackling at trial did not violate Hamilton's due process rights.

### B. *Ineffective Assistance of Counsel*

Hamilton raises a number of contentions relating to the performance of his counsel, Mr. Ryan, at trial. We agree with the district court that none of these contentions, either standing alone or in combination, rise to the level of constitutional violation of the right to effective assistance of counsel. In weighing these contentions, we must bear in mind that in order to demonstrate ineffective assistance of counsel, a habeas petitioner must show that counsel's performance fell below that of a reasonable attorney, and that counsel's errors created a reasonable probability that, but for the errors, the outcome of the proceeding would have been different.

*Strickland v. Washington,* 466 U.S. 668, 687, 694, 104 S.Ct. 2052, 2064, 2068, 80 L.Ed.2d 674 (1984). We deal with each of Hamilton's contentions in turn.

### 1. Counsel's request that Hamilton be shackled.

■ Mr. Ryan made a pretrial request that Hamilton be shackled. The request was based principally upon Hamilton's violent attack on Ryan's assistant which, during the hearing before the district court, the assistant described as "life threatening." Ryan himself testified in the district court that the request was also based on earlier episodes of violence and threats. Ryan further informed the trial court that he was concerned that Hamilton would prejudice his own case if he were to behave violently in front of the jury.

It is difficult to conclude that counsel's pretrial request was unreasonable in the circumstances, but even if we were to so conclude, the request could not have affected the outcome of the trial. This is because Ryan withdrew the shackling request before Hamilton's first appearance before the jury, and Hamilton remained unshackled for six days until the jail outburst against deputies convinced the trial court, over Ryan's objection, that Hamilton should be shackled.

It is true, as Hamilton points out, that the violent episode on October 8 would not in and of itself have justified the shackling, according to the trial judge. Yet, according to the trial judge, Hamilton's demeanor in court also played a large role in the shackling decision. We cannot accept Hamilton's further suggestion that but for Ryan's earlier request for shackling, the trial court would never have known of any other incidents of violence. In considering its options on October 8, the trial court was obligated to become informed of all relevant circumstances, including any prior attacks by Hamilton of which his counsel was aware. If the court had not already known of the prior relevant behavior it should have inquired. *See Jones,* 899 F.2d at 885. In short, Hamilton cannot show how he was prejudiced by Ryan's pretrial request for shackling which was withdrawn before the trial began.

### 2. Failure to investigate and present certain evidence.

Hamilton contends that trial counsel was ineffective because he failed to: (1) investigate and present evidence that the victim was decapitated post-mortem; (2) present an alternative theory as to how the victim's blood appeared on Hamilton's shoe; (3) challenge the prosecution's theory that Hamilton transported the victim's body in her van; and (4) challenge the prosecution's use of Hamilton's identification of the victim.

#### a. Decapitation.

■ The pathologist who performed the autopsy on the victim testified at trial that he was unable to state with certainty whether the victim's head and hands were removed before or after death (42 RT 2337). He did state, however, that the victim was "probably dead" when her hands were cut off (*id.*).

In this habeas petition, Hamilton claims that his counsel at trial, in order to counter the prosecutor's suggestion that the decapitation might have occurred before the victim died should have argued that the decapitation occurred after death.

The district court determined that counsel was not ineffective in declining to make such an argument. We agree that counsel could have reasonably concluded that arguing this point might seem to be an effort to trivialize the crime.

#### b. Blood on the shoe.

■ Hamilton contends that trial counsel was ineffective because he failed to present an alternative theory as to how the victim's blood appeared on Hamilton's shoe. The prosecution's evidence included Hamilton's shoe, stained with blood that analysis revealed matched the victim's blood type and was different from Hamilton's (51 RT 3112, 3114). The defense theory was that the shoe might have been smeared with the victim's blood through contact with the van's blood-stained carpet, as opposed to contact with the victim herself (59 RT 3906). In support of the theory, the defense expert, Mr. Bell, testified at trial that the blood could have been transferred to the shoe from the carpet

(*id.*). However, he conceded on cross-examination that there were no carpet fibers present in the blood on the shoe (*id.*), and the prosecution's expert on rebuttal testified that carpet fibers would have been mixed in with the blood on the shoe if the defense theory were true (60 RT 4018).

At the request of Hamilton's present counsel, Bell conducted an experiment, prior to the district court evidentiary hearing, from which he concluded that it would be possible for blood to have come from the carpet of the van without a transfer of carpet fibers (*id.* at 38). Bell's experiment did not use carpet samples from the van, which were still available as evidence, and he conceded that the samples he used were "somewhat different from the carpet in the van" (*id.* at 36). Bell did not use Hamilton's shoes, or a similar type, in his experiment (IX EH 127). In addition, Bell used blood from a blood bank which had been treated with anticoagulants, so that its clotting capability, consistency and drying time, were different from the victim's blood (*id.* at 126–27). The district court properly found that Bell's experiment was flawed.

During the evidentiary hearing in the district court, Hamilton attempted to establish that counsel was ineffective in never asking the defense expert whether the shoes could have been stained by the carpet without having the blood mixed with carpet fibers. Because of the flaws in the experiment, however, trial counsel cannot be faulted in failing to pursue such a theory. Moreover, even if the testimony had been presented, in view of the flawed experiment, there is no reasonable probability that the trial outcome would have been different. *See Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068. Therefore, there was no denial of effective assistance of counsel in connection with the blood on the shoe.

c. Transportation of the victim's body.

At trial, the prosecutor argued that Hamilton transported the victim's body in the victim's van. This contention was supported by the large blood stain in the storage compartment of the van and presence of carpet fibers matching the carpet of the van on the victim's stomach and arms.

Defense counsel at trial argued that the body was transported in another car driven by the true killer, noting that tire tracks different from those left by the van were discovered in the area from where the body was recovered.

In the evidentiary hearing in the district court, Hamilton attempted to show that counsel could have made additional arguments to rebut the prosecution's case. The district court accurately determined that such arguments were also inconclusive. Hamilton has not shown that any additional investigation of this issue would have led to a more credible argument than that made at trial.

d. Hamilton's identification of the victim.

▉ Hamilton contends that counsel was ineffective because he did not challenge the prosecution's use of Hamilton's identification of the victim. AOB 27–28. This claim lacks merit.

When Hamilton was arrested in Oklahoma, he positively identified the victim from a photograph offered by one of the officers, and correctly identified her by her nickname, "Fran" (49 RT 2873). Hamilton also stated that the victim was wearing light-colored jeans and carrying a beige purse the last time he saw her (*id.* at 2875–76). A friend of the victim testified that when last seen the victim was wearing tan jeans and carrying a tan purse (41 RT 2151).

Hamilton abandoned this story after the victim's body was recovered. He testified that he concocted the story to avoid being charged with theft of the van (54 RT 3481). Hamilton denied that he had ever seen the victim, dead or alive (*id.*). Counsel argued at trial that Hamilton knew the victim through the contents of the purse that he found in the van (*id.* at 3393). Counsel did not specifically attempt to rebut the prosecutor's argument that Hamilton lied when he testified that he had never seen the victim (63 RT 4151–53).

During the evidentiary hearing in district court, Hamilton testified that he was able to identify the victim because there were photographs of her with the purse, as well as

papers indicating that the owner of the van was named Fran (II EH 46–47). Hamilton stated that he came up with the idea that she was wearing light pants because the color of her purse was light (*id.* at 46). The district court found Hamilton's story to be unworthy of belief .(ER 152).

■ Hamilton has failed to show that counsel's performance was deficient under *Strickland.* The district court's finding must be upheld unless clearly erroneous, and nothing in the record suggests that this finding is erroneous. Counsel was faced with very strong evidence supporting the prosecution's theory of identification. Counsel's failure to present an incredible story does not constitute ineffective assistance.

### C. *Denial of Right to Self–Representation*

■ Hamilton contends he was deprived of his right to represent himself in violation of *Faretta v. California,* 422 U.S. 806, 807, 95 S.Ct. 2525, 2527, 45 L.Ed.2d 562 (1975). A trial court must grant a defendant's request to represent himself so long as the request is made knowingly and intelligently. *Id.* at 835, 95 S.Ct. at 2541.

The record before the trial court reflects that Ryan was the third lawyer appointed to represent Hamilton. Hamilton complained about his first attorney's efforts to encourage an insanity plea based upon information he had obtained in violation of confidences. The trial court relieved counsel based upon a "breach of faith." After a second lawyer was appointed, the trial court grudgingly agreed to relieve him upon Hamilton's request, but observed that he saw no reasonable grounds to remove counsel.

When Ryan was appointed, the trial court stated that it would not entertain any more requests to relieve counsel for Hamilton because the trial court believed that Hamilton was seeking to delay the trial. The trial court denied several motions to relieve Ryan before trial, including one on the morning of trial. As the district court found, however, these requests were not unequivocal, *see Armant v. Marquez,* 772 F.2d 552, 555 (9th Cir.1985), *cert. denied,* 475 U.S. 1099, 106

S.Ct. 1502, 89 L.Ed.2d 902 (1986), and many were untimely as they were made just before or after meaningful trial proceedings had begun. *See United States v. Smith,* 780 F.2d 810, 811 (9th Cir.1986).

During the evidentiary hearing, the trial judge and counsel testified that requests for self-representation were not sincere, but were made to delay the trial. The district court's ultimate finding that Hamilton's attempts to relieve counsel were not expressions of unequivocal desire to represent himself, but were made to delay the trial, is amply supported by the record. Hamilton has not demonstrated that his rights under *Faretta* were violated.

### D. *Improper Admission of Evidence*

Hamilton challenges the admissibility of certain evidence. The trial court permitted the admission of Deputy Parson's testimony of Hamilton's threatening statements while he was securing Hamilton's chains in prison, on the basis that they were admissible as a spontaneous declaration, not the result of custodial interrogation. By stipulation, the jury was told that Hamilton had purchased a saw, butcher knife and rope while traveling in the victim's van. The trial court also allowed the admission of three letters written by Hamilton while he was in prison for a prior conviction which demonstrated his fear of prison and willingness to do anything to secure his release (52 RT 3228–30; 3232–36). The trial court ruled that the letters were relevant to show motive under the theory that Hamilton would do anything to avoid returning to prison, including killing the victim, who witnessed his theft of her van (24 RT 324). In addition, the trial court admitted a letter Hamilton wrote where he stated that he knew someone who would kill his attorney and the prosecutor if he were convicted of murder (47 RT 2741). The trial court ruled that the letter was admissible as an attempt to intimidate the prosecution because Hamilton knew that his outgoing mail was being read by prison authorities (*id.* at 2738).

On appeal, the California Supreme Court held that the admission of the three letters Hamilton wrote while in prison for a prior

conviction was error but it was not prejudicial. *People v. Hamilton,* 221 Cal.Rptr. at 911–914, 710 P.2d at 990–992. The court upheld the trial court's admission of the other evidence.

■■■■ Claims of inadmissibility of evidence are cognizable in habeas corpus proceedings only when admission of the evidence violated the defendant's due process rights by rendering the proceedings fundamentally unfair. *Jammal v. Van de Kamp,* 926 F.2d 918, 919 (9th Cir.1991). Although the erroneous admission of the three letters presents different questions with respect to Hamilton's claim concerning the penalty phase instruction, these letters did not render Hamilton's guilt phase fundamentally unfair. There has been no showing that the admission of the remainder of the challenged evidence violated Hamilton's federal rights.

### E. *Eighteen Day Adjournment*

■■■■ During jury selection, prospective jurors were informed there would be a two-week recess during the winter holidays (26 RT 24, 36, 39, 55; 27 RT 90). On December 18, 1980, the trial court consulted with the jury and learned that at least one juror could not deliberate the week immediately preceding Christmas (65 RT 1). After the jury had deliberated for approximately two and one-half days concerning Hamilton's guilt, the trial court recessed the trial until January 5, 1981 without objection from Hamilton (8 RT 1497).

Hamilton contends that the adjournment violated his right to due process because it was unjustified and the court did not properly admonish the jury. AOB 41. His contention is meritless.

Hamilton relies on *People v. Santamaria,* 229 Cal.App.3d 269, 280 Cal.Rptr. 43 (1991) to support his claim. In *Santamaria,* the California Court of Appeal held that the trial court's recess order of eleven days during jury deliberations violated the defendant's right to due process. *Id.,* 280 Cal.Rptr. at 48. In so holding, the court noted that the trial court did not specify the reason for the recess, and there was no indication of any exceptional circumstances which warranted the adjournment. *Id.*

Hamilton's case is distinguishable from *Santamaria* because not only was the adjournment pre-planned, but the court also had a legitimate reason to adjourn the trial. Although the court could have been more stern in instructing the jury not to discuss the case, Hamilton has failed to show that the adjournment and the admonition rendered his trial unfair. *See Jammal,* 926 F.2d at 919. The holiday recess did not deny Hamilton due process.

### II. *Challenges to the Penalty Phase*

### A. *The Modified Briggs Instruction on Commutation*

■■■■ Of all the claims raised by Hamilton in this appeal, the most serious relates to the instruction given to the jury during the penalty phase describing the effect of a life sentence without the possibility of parole. Hamilton contends that far from aiding the jury in making a reasoned and informed choice between a sentence of life and death, as due process requires, the instruction given misled the jury as to the likelihood of parole eligibility, encouraged, rather than discouraged the jury from speculating about parole, and distracted the jury from considering relevant mitigating evidence in violation of the Eighth and Fourteenth Amendments.

■■■■ It is well established that because the punishment of death is qualitatively different from other forms of punishment, there is a greater need for reliability in determining whether a death sentence is appropriate in a particular case. *See Fetterly v. Paskett,* 997 F.2d 1295, 1301 (9th Cir. 1993) (quoting *Woodson v. North Carolina,* 428 U.S. 280, 303–305, 96 S.Ct. 2978, 2990–2992, 49 L.Ed.2d 944 (1976)). Thus, the requirements of the Eighth and Fourteenth Amendments dictate that:

> where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.

*Gregg v. Georgia*, 428 U.S. 153, 189, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976) (opinion of Stewart, Powell, and Stevens, JJ.). To avoid the "arbitrary and capricious" imposition of the death penalty, the sentencing body's attention should be directed to the specific circumstances of the crime and the characteristics of the defendant. *Id.* at 197, 96 S.Ct. at 2936; *see also Zant v. Stephens*, 462 U.S. 862, 879, 103 S.Ct. 2733, 2744, 77 L.Ed.2d 235 (1983).

 In channelling the jury's discretion, however, the Eighth Amendment requires that a sentencing scheme allow the jury to consider all relevant mitigating evidence. In analyzing whether a sentencing phase instruction violates the Eighth Amendment, a court must determine if there is a reasonable likelihood that the jury applied the instruction in such a way that prevented consideration of relevant mitigating evidence. *Boyde v. California*, 494 U.S. 370, 380, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316 (1990). A penalty phase instruction violates the Eighth Amendment if it prevents the jury from giving a reasoned moral response to the petitioner's mitigating evidence, *Penry v. Lynaugh*, 492 U.S. 302, 319, 109 S.Ct. 2934, 2947, 106 L.Ed.2d 256 (1989) or creates the risk that the death penalty would be imposed despite evidence which may call for a life sentence, *Lockett v. Ohio*, 438 U.S. 586, 605, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973 (1978). Therefore, we must examine the challenged instruction in light of these exacting standards for fair and informed jury deliberation in death penalty cases. We conclude that due process and the Eighth Amendment's prohibition against cruel and unusual punishment combine to require a new penalty phase trial.

The problems in the case stem from the now repealed provision in California law requiring the trial court to instruct the jury in a capital case that the Governor had the authority to commute a life sentence. The instruction commonly given was known as the "Briggs" instruction[1], and provided as follows:

> You are instructed that under the state constitution, a governor is empowered to grant a reprieve, pardon or commutation after sentence following conviction of a crime. Under this power a governor may in the future commute or modify a sentence of life imprisonment without possibility of parole to a lesser sentence that would include the possibility of parole.

The instruction was controversial from its inception and was considered by the United States Supreme Court in *California v. Ramos*, 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983).[2] The Court held, in the circumstances of that case, that the two-sentence instruction survived federal constitutional scrutiny.

In upholding the instruction in *Ramos*, the United States Supreme Court emphasized that the Briggs instruction itself was aimed at accuracy. It intended to correct the inaccuracy of the sentence description under California law as " 'life imprisonment *without possibility* of parole' ... when, under state law, the Governor possesses authority to commute that sentence to a lesser sentence that includes the possibility of parole." *Id.* at 1009, 103 S.Ct. at 3457–58 (emphasis in original). The necessary corollary of that holding that guides our analysis in this case is that if an instruction is inaccurate or misleading it will not be upheld.

In this case the two-sentence instruction at issue in *Ramos* did not accurately describe the life sentence which would be imposed on Hamilton and the instruction given in *Ramos* was not given in this case. When the state proposed it, defense counsel objected to any

---

**1.** The Briggs instruction was incorporated into the California Penal Code as a result of a 1978 voter initiative. *See California v. Ramos*, 463 U.S. 992, 995 n. 4, 103 S.Ct. 3446, 3450 n. 4, 77 L.Ed.2d 1171.

**2.** The Briggs instruction is no longer given, for in *Ramos*, on remand, the California Supreme Court found the Briggs instruction to violate the California Constitution's due process clause be-

cause "it is seriously and prejudicially misleading and because it invites the jury to be influenced by speculative and improper considerations." *People v. Ramos*, 37 Cal.3d 136, 207 Cal.Rptr. 800, 809–10, 689 P.2d 430, 439–40 (1984) (*Ramos II*), *cert. denied*, 471 U.S. 1119, 105 S.Ct. 2367, 86 L.Ed.2d 266 (1985). The penalty phase trial of this case took place before the decisions in *Ramos*.

Briggs' instruction being given. Defense counsel objected, in part, because in this case, unlike *Ramos*, the defendant had been convicted of two prior felonies. The Governor in this case, therefore, could not commute a life sentence without possibility of parole to a life sentence with possibility of parole unless at least four of the California Supreme Court justices had given prior approval. *See* Cal.Penal Code § 4852 (Deering 1992); California Constitution, Article 5 § 8 (Deering 1981). Defense counsel objected to any instruction involving speculation on the possibility of parole and made clear the defense position that if any instruction on parole were to be given it would have to incorporate substantial modification of the *Briggs* instruction.

The prosecution proposed modifying the two sentence Briggs instruction in order to explain that in Hamilton's case parole could be considered after 25 years had been served on a life sentence, less one-third off for good time credits. This proposal effectively told the jury that if it sentenced Hamilton to life imprisonment without possibility of parole, he would be eligible for parole after serving only 16 years and 8 months in prison. This was incorrect. Hamilton would be eligible for parole only if the sentence were commuted to life imprisonment with the possibility of parole. This fact was not explained in the prosecution's requested instruction to the jury. The proposed instruction was therefore misleading and inaccurate.

The prosecution also requested, as part of the same instruction, language instructing the jury that the subject of commutation, modification, or parole "is not to be considered by you in determining the punishment for Mr. Hamilton." This was wholly inconsistent with the prosecution's request that the jury be expressly instructed to consider the Governor's power of commutation and when Hamilton would be eligible for parole.

Finally, the prosecution requested a lengthy, "cautionary" addition to the Briggs instruction that the jury not speculate what the various governmental officials would do if the matter of Hamilton's parole were before them; the jury was to assume that the officials would not release Hamilton unless it was safe to do so. This language not only created a negative implication that the officials would not properly perform their jobs, but it invited the jury to assume that the question of Hamilton's release would automatically come before these officials. This too was inaccurate.

The instruction eventually given was cobbled together by the court when it ruled, with the eventual consent of counsel, that it would give the Briggs instruction as modified by all proposals from both sides. The dissent erroneously suggests that defense counsel was satisfied with the resulting instruction, but the record demonstrates that defense counsel wanted no instruction on parole and had to settle for a modified instruction. The result was a confusing pastiche that provided, after the two sentence Briggs instruction itself, as follows:

> This is subject to the requirement that, in the case of any person twice convicted of a felony, a commutation or modification may not be granted absent the written recommendation of at least four justices of the California Supreme Court. Further, a life sentence requires a minimum incarceration of 25 years less one-third off for good time credits before parole may be considered by the proper authorities. You are now instructed, however, that the matter of a possible commutation or modification of sentence is not to be considered by you in determining the punishment for Mr. Hamilton. You must not speculate as to whether such commutation or modification would ever occur. It is not your function to decide now whether this man will be suitable for parole at some future date. So far as you are concerned, you are to decide only whether this man shall suffer the death penalty or whether he shall be permitted to remain alive. If upon consideration of the evidence you believe that life imprisonment without possibility of parole is the proper sentence, you must assume that the Governor, the Supreme Court, and those officials charged with the operation of our parole system will perform their duty in a correct and responsible manner, and that Mr. Hamilton will not be paroled unless he can safely be released into soci-

ety. It would be a violation of your duty as jurors if you were to fix the penalty at death because of a doubt that the Governor and other officials will properly carry out their responsibilities.

This instruction is very different from the two-sentence instruction upheld by the United States Supreme Court in *Ramos*. That instruction invited no predictions on what the Governor might do, *Ramos*, 463 U.S. at 1005, 103 S.Ct. at 3455. In stark contrast, the instruction in this case so focused on the commutation and parole process that speculation was inevitable, and not only about the Governor, but about the state Supreme Court, and parole officials as well.

The United States Supreme Court in *Ramos* did not permit the jury to speculate about the likelihood of the defendant's release on parole, for it assumed that the trial court would provide the jury with accurate information concerning the likelihood of commutation and parole. *Ramos*, 463 U.S. at 1004, 103 S.Ct. at 3455. Furthermore, the Court in *Ramos* assumed that the instruction did not preclude the defendant from offering any evidence regarding the Governor's power to commute a life sentence without possibility of parole. *Id.* However, California case law in effect at the time Hamilton was sentenced prevented defense counsel from showing the actual likelihood of a person ever being paroled if he were sentenced to life imprisonment. *See People v. Morse*, 60 Cal.2d 631, 36 Cal.Rptr. 201, 211, 388 P.2d 33, 43 (1964).[3]

In fact, although defense counsel was not permitted to present such information, the hurdles standing in the way of parole eligibility were formidable indeed. In California, a person who is a twice-convicted felon such as Hamilton must apply directly to the Governor in order to have his sentence commuted. *See* Cal.Penal Code § 4802 (Deering 1992). The Governor, upon receipt of the application, must refer it to the Board of Prison Terms for an investigation and recommendation. *Id.* After the Board of Prison Terms makes its recommendation, it transfers the application along with the recommendation

back to the Governor. *See* Cal.Penal Code § 4813 (Deering 1992). Even if the Board of Prison Terms recommends commutation, the Governor cannot commute a sentence of life without parole unless four justices of the California Supreme Court recommend commutation. *See* Cal.Penal Code § 4852 (Deering 1992); California Constitution, Article 5 § 8 (Deering 1981). Furthermore, even if both the Board of Prison Terms and four justices of the Supreme Court recommend commutation, the Governor has the authority to reject the recommendations. California Constitution, Article 5 § 8 (Deering 1981).

The instruction as given incorrectly suggested that if the jury decided to sentence Hamilton to life without possibility of parole, he would nevertheless be eligible for release. Thus, the jury was invited to speculate that the only way it could avoid Hamilton's likely release was to sentence him to death. The probability of the jury's improper speculation was compounded by the prosecutor's inappropriate assertion in closing argument that Hamilton, if sentenced to prison, would be "conniving and devising ways to manipulate the system and get out." The prosecutor relied on inflammatory and largely irrelevant letters written by Hamilton years earlier showing his fear of prison. The California Supreme Court held that the admission of the letters was error but it was not prejudicial to the guilt phase. *People v. Hamilton*, 221 Cal.Rptr. at 911–914, 710 P.2d at 990–992. The court, however, inadequately considered the effect of the letters at the penalty phase.

 In considering whether a defendant should be sentenced to death, the jury must be able to exercise the "guided discretion," required by the Eighth Amendment, by limiting its penalty deliberations to the characteristics of the defendant and the circumstances of the offense. *See Gregg*, 428 U.S. at 197, 96 S.Ct. at 2936. In exercising this discretion, the jury must consider relevant mitigating evidence. *See Penry*, 492 U.S. at 319, 109 S.Ct. at 2947. The jury in this case was diverted from this task by having its

---

**3.** In *Morse*, the jury was deciding between the death penalty and life *with* the possibility of parole.

attention focused on commutation procedures rather than the significant mitigating evidence defense counsel introduced at the penalty phase.

Defense counsel called seven witnesses. They included two of Bernard Hamilton's brothers, his mother, a neighbor and Hamilton's pastor. The jury spent three days deliberating in the penalty phase, suggesting that the California jury saw this as a close case. *See People v. Murtishaw,* 29 Cal.3d 733, 175 Cal.Rptr. 738, 763, 631 P.2d 446, 471 (1988), holding that deliberation of two days in the penalty phase suggested the issue was close. The lengthy deliberation, coupled with the mitigating evidence presented, supports the conclusion that the detailed instruction on the possibility of commutation and parole prevented the jury from properly considering Hamilton's penalty.

In short, the modified instruction given in this case did the very thing that the United States Supreme Court in *Ramos* said the instruction in that case did not do: the instruction in this case created inaccuracies and confusion. The two-sentence Briggs instruction upheld in *Ramos* was inapplicable to Hamilton because, unlike the defendant in *Ramos,* Hamilton was a twice-convicted felon and therefore was subject to different commutation requirements. The trial court's modifications of the Briggs instruction, however, did not cure the problems created by the inaccuracy; rather, they allowed the jury to impose a death sentence based upon improper assumptions concerning parole eligibility.

We cannot accept the district court's conclusion that the instruction favored Hamilton. The district court stated that the instruction informed the jury that the possibility of parole was "remote." As we have seen, however, the instruction had the opposite effect by suggesting that Hamilton would come before parole authorities in less than 17 years. Hamilton was 30 years old at the time of trial, so the jury could have assumed, based upon the instruction, that there was a likelihood that Hamilton would be released from prison by the time he was 47 if it decided to impose a sentence of life without possibility of parole. There was, however, no such like-lihood. The dissent articulates no reason why the instruction favored the defendant but begs the question by incorrectly assuming the defense counsel wanted the instruction.

The district court, citing *Boyde,* also relied upon the "absence in the record" of any showing that the jury failed to listen to the trial court's admonition not to consider the possibility of commutation. *Boyde,* however, requires us to look at the instructions as a whole to determine whether there is a reasonable, objective likelihood that the jury was misled. *Boyde,* 494 U.S. at 380, 110 S.Ct. at 1198. Here, where the trial court told the jury not to consider what it had just been instructed were relevant considerations, the jury must have been misled. The admonition to the jury that it should not consider the possibility of events that had just been described could not cure the error. The jury was required to decide issues of life or death with instructions it could not follow. This is something the Constitution does not permit.

> There are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored.

*Bruton v. United States,* 391 U.S. 123, 135, 88 S.Ct. 1620, 1627, 20 L.Ed.2d 476 (1968).

The dissent appears to contend that, under *Boyde,* there is no constitutional violation unless the defendant proves that the jury has actually used the challenged instruction in an impermissible way. *Boyde*'s standard, although "stringent," is not that stringent. The standard announced by the court in *Boyde* is whether "there is a reasonable likelihood that the jury has applied the challenged instruction" unconstitutionally. *Boyde,* 494 U.S. at 380, 110 S.Ct. at 1198:

> Although a defendant need not establish that the jury was more likely than not to have been impermissibly inhibited by the instruction, a capital sentencing proceeding is not inconsistent with the Eighth Amendment if there is only a possibility of such inhibition. This 'reasonable likelihood' standard, we think, better accommodates the concerns of finality and accuracy than

does a standard which makes the inquiry dependent on how a single hypothetical 'reasonable' juror could or might have interpreted the instruction.

*Id.* For the reasons discussed, we have no difficulty concluding that there is a reasonable likelihood that the jury impermissibly applied the modified Briggs instruction.

New penalty phase proceedings are therefore required, and without any Briggs instruction, in light of the intervening clarification of California law. *See Ramos II,* 207 Cal.Rptr. at 814, 689 P.2d at 444 (remanding case for new penalty phase without Briggs instruction). The jury in this case deliberating under these instructions could not have made the constitutionality mandated reasoned and informed choice between a sentence of life imprisonment without possibility of parole and a sentence of death.

### B. *Ineffective Assistance of Counsel*

Hamilton contends that his counsel, Mr. Ryan, was ineffective because he did not argue to the jury that it should consider lingering doubt about Hamilton's guilt as a mitigating factor in the penalty phase.

The district court found that Ryan could have reasonably concluded that the jury would not be persuaded by such an argument. We agree.

### C. *Claimed Violation of Ex Post Facto Clause in California Supreme Court Decision on Remand from United States Supreme Court*

The California Supreme Court on direct appeal initially reversed the death penalty, holding that the trial court's failure to instruct that intent to kill was an element of the felony murder special circumstance mandated reversal under *Carlos v. Superior Court,* 35 Cal.3d 131, 197 Cal.Rptr. 79, 672 P.2d 862 (1983). *People v. Hamilton,* 41 Cal.3d 408, 221 Cal.Rptr. 902, 916, 710 P.2d 981, 995 (1985). The United States Supreme Court granted certiorari and vacated and remanded for reconsideration in light of *Rose v. Clark,* 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986), which held that harmless error analysis may apply to jury instructions that erroneously shift the burden of proof to the defendant. *California v. Hamilton,* 478 U.S. 1017, 106 S.Ct. 3328, 92 L.Ed.2d 734 (1986).

Before the remand, however, the California Supreme Court had overruled *Carlos. People v. Anderson,* 43 Cal.3d 1104, 240 Cal. Rptr. 585, 604, 742 P.2d 1306, 1325 (1987). On remand of Hamilton's sentence from the United States Supreme Court, the California Supreme Court applied its holding in *Anderson* and affirmed the death sentence, holding that the instruction was not erroneous.

Hamilton now argues that the Supreme Court's application of *Anderson* was a violation of the Ex Post Facto Clause of the Constitution AOB 60.

This court has held, however, that retroactive application of *Anderson* does not offend federal rights where, as here, the conviction occurred before *Carlos* was decided. *Hughes v. Borg,* 898 F.2d 695, 705 (9th Cir. 1990); *see also Hunt v. Vasquez,* 899 F.2d 878, 881 (9th Cir.1990). Therefore, retroactive application of *Anderson* is not a violation of defendant's rights protected under federal law.

### III. *Denial of the 60(b) Motion*

Hamilton appeals from the district court's denial of his Rule 60(b) motion in which he asks the district court to consider a myriad of claims that were not exhausted in the state court until after the district court entered its judgment denying habeas relief on the exhausted claims and which the district court determined on the merits. Hamilton asks us to hold that the district court abused its discretion in denying the 60(b) motion because he was taken aback by the Supreme Court's decision in *McCleskey v. Zant,* 499 U.S. 467, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991), holding that petitioners filing subsequent habeas corpus petitions must show cause and prejudice for failing to raise the claims in a first petition for habeas corpus. Hamilton claims that he had relied upon the pre-*McCleskey* law permitting more lenient filing of subsequent habeas petitions when he refrained from earlier exhausting the Rule 60(b) motion claims. He maintains it was reasonable for him, before *McCleskey*

was decided, to ask the district court to decide some claims and, only when and if those claims were unsuccessful, proceed to his other claims and bring a subsequent petition.

We would be sympathetic to Hamilton's argument if he had in fact reasonably assumed that all unexhausted claims could be presented without restriction in a subsequent petition. However, in this particular case, it was not reasonable for Hamilton to make such an assumption, because the district court repeatedly warned Hamilton that if he did not exhaust all his claims and present them in a timely manner in his original petition, the district court would deem the unexhausted claims waived. In these unusual circumstances, we cannot hold that it was an abuse of discretion for the district court to refuse to grant the Rule 60(b) motion and require Hamilton to present those claims in a subsequent petition subject to the strictures of *McCleskey*.

A more detailed presentation of the chronology reflects not only that Hamilton was repeatedly warned that he should exhaust all claims in order to ensure a full hearing on them, but that Hamilton could, with a brief application to the California Supreme Court, have secured such exhaustion without unduly delaying the district court proceedings.

On March 8, 1990, the district court ordered Hamilton to identify all claims he intended to raise in his habeas petition in accordance with Judge Alarcon's concurrence in *Neuschafer v. Whitley*, 860 F.2d 1470, 1482 (9th Cir.1988), *cert. denied*, 493 U.S. 906, 110 S.Ct. 264, 107 L.Ed.2d 214 (Alarcon, J., concurring). Hamilton identified 38 claims on June 8, 1990, including the claim that Jesse Moffet might have committed the murder for which Hamilton was convicted. (ER 5). The district court eventually gave Hamilton until October 22, 1990 to either exhaust his state remedies with respect to the identified claims that were unexhausted, or present a habeas petition containing only exhausted claims. The district court was willing to stay consideration of Hamilton's habeas proceeding if he demonstrated that he initiated state proceedings prior to October 22 (ER 19). In its order, however, the district court warned Hamilton that if he presented only his exhausted claims, he would be subject to abuse of the writ principles if he were to later raise additional claims (*id.*). Hamilton chose to raise only the exhausted claims, and did so on October 22.

On April 16, 1991, the Supreme Court decided *McCleskey v. Zant*, 499 U.S. 467, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991), which held that a habeas petitioner had to demonstrate cause and prejudice in failing to raise his claims in his first federal habeas petition. On April 23, 1991, Hamilton's evidentiary hearing commenced. On May 9, 1991, at the close of the evidentiary hearing, Hamilton moved to stay the closing of the hearing in light of *McCleskey* so that he could exhaust state remedies. The district court denied this request. Hamilton asked the court to reconsider this motion on July 1, 1991, which the court denied on August 23. On this date, the court also denied Hamilton's habeas petition. Hamilton filed a motion for reconsideration, which was denied on November 1, 1991.

Hamilton filed a habeas petition in the California Supreme Court on December 30, 1991, raising the unexhausted claims that were identified in his June 8, 1990 filing in the district court. The California Supreme Court denied his petition without citation on February 17, 1992. On March 17, 1992, Hamilton filed a Rule 60(b) motion in the district court. This court ordered a limited remand so that the district court could consider the 60(b) motion. The district court denied the motion.

Hamilton has failed to show excusable neglect for not attempting to exhaust his state remedies between June 8, 1990, and October 22, 1990. Nowhere in his brief does he explain why he could not present his unexhausted claims to the California Supreme Court during this time period. Hamilton complains of the fact that the district court denied his discovery requests concerning the Moffet claim, but the district court has the discretion to deny discovery in habeas proceedings, particularly for claims that are unexhausted. *See* Rule 6(a), Rules Governing Section 2254 Cases.

Hamilton's reliance on *Coleman v. Vasquez*, 771 F.Supp. 300, 303–04 (N.D.Cal.1991) is misplaced. In *Coleman*, the district court stayed briefing and granted the petitioner's discovery request in light of *McCleskey. Id.* at 303–04. However, the petitioner in *Coleman* had filed his amended habeas petition only seven weeks prior to the *McCleskey* decision and had not been ordered to present all of his claims in a single petition as Hamilton was. *See also Bonin v. Vasquez*, 999 F.2d 425, 426–27 (9th Cir.1993) (affirming denial of 60(b) motion where petitioner was ordered to present all of his claims in a single habeas petition and failed to do so).

The district court's order denying Hamilton's Rule 60(b) motion was not an abuse of discretion and must be affirmed.

Appellant has submitted a brief pro se. We have reviewed all of his claims and to the extent that they differ from those presented by counsel, they are rejected.

*Conclusion*

The order of the district court denying Hamilton's Rule 60(b) motion to consider previously unexhausted claims as part of the original habeas petition is AFFIRMED. The district court's denial of habeas relief on Hamilton's claim that the instruction in the penalty phase of the trial violated his Eighth and Fourteenth Amendment rights is REVERSED and the matter is REMANDED to the district court with instructions to order new penalty phase proceedings. The judgment of the district court is in all other respects AFFIRMED.

AFFIRMED IN PART; REVERSED AND REMANDED IN PART.

TROTT, Circuit Judge, concurring and dissenting.

"On May 31, 1979, about 1 p.m., the body of Eleanore Frances Buchanan was discovered in the grass near a cul-de-sac off Pine Valley Road, near San Diego. Harry Piper noticed it while walking back to his car from target shooting. The body had no head or hands and was clothed only in a bra, underpants, and socks. ... Terry Buchanan, the victim's husband, testified that his wife had given birth to a baby boy three weeks before her death and that she was still nursing him on May 30, 1979." *People v. Hamilton*, 45 Cal.3d 351, 357–58, 247 Cal.Rptr. 31, 753 P.2d 1109 (1988).

For this kidnapping and killing during which Bernard Lee Hamilton brutally took Eleanore Buchanan's life, Terry Buchanan's wife, and their son's mother, Hamilton has been convicted of murder and sentenced to death. I am unable to identify any Constitutional infirmity either in his conviction or his sentence.

I

The Supreme Court has validated the practice of inviting jurors in the penalty phase of a state death penalty case to consider in their deliberations that a sentence of life without possibility of parole is really a sentence of life with possibility of commutation. *California v. Ramos*, 463 U.S. 992 n. 19, 103 S.Ct. 3446 n. 19, 77 L.Ed.2d 1171 (1993). In approving this practice, the Court specifically determined that a jury instruction containing such information is compatible with the Eighth and Fourteenth Amendments. Notwithstanding the Court's definitive holding on this issue, the majority conclude that providing a jury with such information in this case violates the Constitution, even though the jury was told to disregard that information in arriving at its verdict, and even though the California Supreme Court has analyzed the effect of the admonition to disregard and concluded that it was effective. In so holding the majority rely on arguments made and rejected in *Ramos*. I do concur in the majority opinion to the extent that it affirms (1) the district court's denial of the Rule 60(b) motion, and (2) the district court's denial of relief on the merits of Hamilton's claims concerning the validity of the underlying convictions. I respectfully dissent, however, from the majority's decision to reverse the district court's denial of habeas relief as to Hamilton's sentence and to remand with instructions to order a new penalty phase for the petitioner. I do so because I am convinced that the majority opinion exceeds our authority under habeas corpus.

II

A.

My disagreement with the majority's analysis as to the validity of Hamilton's death sentence is essentially twofold. First, I believe generally that the majority's analysis of the disputed commutation instructions is so entangled with concerns about purely state law matters that it trespasses on the Supreme Court's admonition that " 'federal habeas corpus relief does not lie for errors of state law.' " *Estelle v. McGuire,* —— U.S. ——, ——, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991) (quoting *Lewis v. Jeffers,* 497 U.S. 764, 780, 110 S.Ct. 3092, 3102, 111 L.Ed.2d 606 (1990)). The question as I see it is only whether the disputed instruction violated Hamilton's federal Constitutional rights, particularly his Fourteenth Amendment right to due process of law and his rights under the Eighth Amendment, not whether the Briggs Instruction violated the California Constitution, or whether the instruction was completely accurate as to California's commutation requirements, or what a twice-convicted felon must do to have his sentence commuted.

Second, I do not believe the disputed jury instruction did violate any of Hamilton's federal Constitutional rights. The majority opinion is correct that the disputed instruction in this case is different from the Briggs Instruction approved in *Ramos.* After studying *Ramos,* however, I do not believe the differences are Constitutionally significant. This is a classic case of differences being insufficient to create a viable legal distinction. However, even if I start from the majority's position that there is something possibly distracting about part of the disputed instruction, I am unable to conclude that it infringed on Hamilton's Constitutional rights.

In summary, I respectfully believe the majority opinion inappropriately magnifies state law technicalities into a federal Constitutional infirmity. *Compare Fetterly v. Paskett,* 997 F.2d 1295 (9th Cir.1993) (allegation of misapplication of state sentencing law held to raise a federal Constitutional issue).

B.

In *Boyde v. California,* 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990) the Supreme Court set out the standard by which we evaluate disputed instructions in this context. When an instruction is assailed as ambiguous and subject to an erroneous interpretation, the proper inquiry is "whether there is a reasonable likelihood that the jury *has applied* the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Id.* at 380, 110 S.Ct. at 1198 (emphasis added). In so mandating, the Court rejected lesser formulations such as what a reasonable juror "could have" or "would have" done in the shadow of the disputed instruction, as well as whether there was a " '*substantial possibility* that the jury may have rested its verdict on the "improper ground." ' " *Id.* at 379, 110 S.Ct. at 1197. Instead, the Court chose a test which Justice Marshall acknowledged in dissent to be "stringent," albeit unduly so in his judgment. *Id.* at 387, 110 S.Ct. at 1201 (Marshall, J., dissenting); *see also Cupp v. Naughten,* 414 U.S. 141, 146, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973) (" '[I]t must be established not merely that the instruction is undesirable, erroneous, or even "universally condemned," but that it violated some [Constitutional right].' " (*quoted in Estelle v. McGuire,* —— U.S. ——, ——, 112 S.Ct. 475, 482, 116 L.Ed.2d 385 (1991); *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974))). In explaining the application of the new test, the Court explicitly repudiated conjecture about the behavior of the jury as a basis for overturning a verdict, evoking the "strong policy against retrials years after the first trial where the claimed error amounts to no more than speculation." *Boyde,* 494 U.S. at 380, 110 S.Ct. at 1198.

The Court likened its new test to exacting tests applicable to other inquiries:

In other contexts, we have held that a defendant cannot establish a constitutional violation simply by demonstrating that an alleged trial-related error could or might have affected the jury. To establish that ineffective assistance of counsel violates the Sixth Amendment, for example, a de-

fendant must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Deportation of potential defense witnesses does not violate due process unless "there is a reasonable likelihood that the testimony could have affected the judgment of the trier of fact." And failure of the prosecution to disclose allegedly exculpatory evidence to the defense violates due process "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." To receive a new trial based on newly discovered evidence, a defendant must demonstrate that the evidence would more likely than not lead to a different outcome.

*Id.* at 380 n. 4, 110 S.Ct. at 1198 n. 4 (citations omitted). These analogies inform our judgment as we perform our task in this case, as does the Court's statement that "we 'have defined the category of infractions that violate "fundamental fairness" very narrowly.'" *Estelle,* —— U.S. at ——, 112 S.Ct. at 482 (quoting *Dowling v. United States,* 493 U.S. 342, 352, 110 S.Ct. 668, 674, 107 L.Ed.2d 708 (1990)).

## C.

In assessing the effect of a challenged jury instruction, the rule is that it " 'may not be judged in artificial isolation, but must be viewed *in the context of the overall charge.*' " *Boyde,* 494 U.S. at 378, 110 S.Ct. at 1196 (emphasis added) (quoting *Cupp v. Naughten,* 414 U.S. 141, 146–47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973)). The majority opinion looks only at part of the charge. Reading the charge *as a whole* in light of the record convinces me there is no reasonable likelihood the jury applied the challenged instruction in a way that prevented the consideration of Constitutionally relevant evidence. I set forth in an appendix to this opinion the complete charge to the jury. The following excerpts from the jury instructions, many of which are completely ignored in the majority opinion, convince me that the jury focused on the evidence, the mitigating factors, and the aggravating factors, not some extraneous matter:

In determining which penalty is to be imposed on the defendant, you shall consider all of the *evidence* which has been received during any part of the trial of this case. (emphasis added)

You shall take into account and be guided by the following factors, if applicable: [followed by a statement of the possible aggravating and mitigating factors in the case].

I have previously read to you the list of aggravating circumstances which the law permits you to consider if you find that any of them is established by the evidence. *These are the only aggravating circumstances that you may consider. You are not allowed to take account of any other facts or circumstances as a basis for deciding that the death penalty would be an appropriate punishment in this case.* (emphasis added)

Before you consider any fact as an aggravating circumstance, you must find that *fact* has been established by the *evidence* beyond a reasonable doubt. (emphasis added)

In order to impose a death sentence, you must be convinced beyond a reasonable doubt that the totality of the aggravating circumstances outweigh the totality of the mitigating circumstances.

You are now instructed, however, that the matter of a *possible commutation or modification of sentence is not to be considered by you* in determining the punishment for Mr. Hamilton. *You must not speculate as to whether such commutation or modification would ever occur. It is not your function to decide now whether this man will be suitable for parole at some future date.* So far as you are concerned, you are to decide only whether this man shall suffer the death penalty or whether he shall be permitted to remain alive. If upon consideration of the evidence you believe that life imprisonment without possibility of parole is the proper sentence, you must assume that the governor, the Supreme Court, and those officials charged with the operation of our parole system perform their duty in a correct and

responsible manner, and that Mr. Hamilton will not be paroled unless he can safely be released into society. *It would be a violation of your duty as jurors if you were to fix the penalty at death because of the doubt that the governor and other officials will properly carry out their responsibilities.* (emphasis added)

The Supreme Court has already told us that the first two sentences of the disputed instruction do not offend the Constitution. *See California v. Ramos,* 463 U.S. 992, 103 S.Ct. 3446; 77 L.Ed.2d 1171 (1983). The Court could find no Constitutional infirmity in telling jurors that a sentence of life without possibility of parole is really a sentence of "life imprisonment with possibility of commutation." *See id.* at 1005 n. 19, 103 S.Ct. at 3455 n. 19. The Court concluded: "[T]he Briggs Instruction does not violate any of the substantive limitations this Court's precedents have imposed on the capital sentencing process. It does not preclude individualized sentencing determinations or consideration of mitigating factors, nor does it impermissibly inject an element too speculative for the jury's deliberation." *Id.* at 1013, 103 S.Ct. at 3459–60. If telling a jury about a governor's power to commute or modify a sentence of life without possibility of parole does not violate the Constitution, I do not understand how adding marginal information about what happens under state law to twice-convicted felons and about minimum incarceration time changes the diagnosis. If anything, the added language the majority opinion finds offensive works in Hamilton's favor when compared to the basic Briggs Instruction because it adds significant legal impediments to any possibility that Hamilton might ever be freed of a life sentence. In this respect, I agree with our respected colleague on the district court. Judge Brewster said in his impressive 93–page opinion: "Most importantly, the modifications agreed to by the parties improved the unmodified Briggs Instruction from the defense perspective. In this regard, it should be noted that the impetus behind the modification *came from petitioner's trial counsel,* who was seeking to mitigate the impact of the unmodified Briggs Instruction." *Hamilton v. Vasquez,* Nos. 86–2101–B & 90–0291–B, at 79 (S.D.Cal. Aug. 23, 1991) (order denying petitions for writ of habeas corpus) (emphasis added).

There is an interesting twist to this issue. On remand from the United States Supreme Court in the *Ramos* case, the California Supreme Court held that the Briggs Instruction violated California's constitution. *People v. Ramos,* 37 Cal.3d 136, 153, 207 Cal.Rptr. 800, 689 P.2d 430 (1984), *cert. denied,* 471 U.S. 1119, 105 S.Ct. 2367, 86 L.Ed.2d 266 (1985). In his second appearance before the California Supreme Court, Hamilton then argued on the basis of the new *Ramos* decision that the use of the now-defunct Briggs Instruction in his case should entitled him to a new penalty phase trial. Not so, responded Justice Mosk for the same court that had recently rejected the Briggs Instruction. Why? Because language in the disputed instruction in Hamilton's case, unlike the Briggs Instruction in *Ramos,* told the jurors *not* to consider commutation or modification of any life without possibility of parole sentence. In answer to Hamilton's argument that the admonitory supplemental language did not cure the state law problem created by the now-defunct Briggs Instruction, but rather led the jurors to indulge in irrelevant and improper speculation, the California Supreme Court tendered a good and sufficient answer which the majority opinion rebuffs in its analysis: "The clear meaning of the plain words of the admonition ... refutes this argument." *People v. Hamilton,* 45 Cal.3d 351, 375, 247 Cal. Rptr. 31, 753 P.2d 1109 (1988), *cert. denied,* 488 U.S. 1047, 109 S.Ct. 879, 102 L.Ed.2d 1002 (1989). Not only does this answer make sense on its face, but it is consistent with the longstanding principle neglected in the majority opinion that jurors are presumed to follow admonitory instructions given by the court unless the information they are ordered to disregard posed a "substantial threat" to a defendant's Constitutional rights. *See Bruton v. United States,* 391 U.S. 123, 137, 88 S.Ct. 1620, 1628, 20 L.Ed.2d 476 (1968). *See also Estelle,* —— U.S. at —— –——, 112 S.Ct. at 483–84 (relying on limiting language to "guard[ ] against possible misuse of [an] instruction"). Informed by the Supreme Court's decision and analysis in *California v. Ramos,* I do not find such a sub-

stantial threat in this case. The prosecutor's isolated remark during argument does not change this analysis. I agree with Judge Brewster that the remark was of no moment. *See Boyde,* 494 U.S. at 384, 110 S.Ct. at 1200 (arguments of counsel do not generally decrease impact of jury instructions).

The opinion of the California Supreme Court notwithstanding, the majority opinion claims the prosecutor requested the jury be told *"to consider* the Governor's power of commutation" and Hamilton's "eligibil[ity] for parole" (emphasis added). This claim is misleading. *State law* controlling at the time of trial *required* the judge to give the Briggs Instruction to the jury. The prosecution expressly asked the trial judge to tell the jurors *not* to consider this subject when determining Hamilton's punishment. More importantly, however, there is simply no Constitutional infirmity in "inviting capital sentencing juries to *consider* the commutation power in its sentencing decisions." *Ramos,* 463 U.S. at 998 n. 8, 103 S.Ct. at 3451 n. 8. This is not my claim; it is the precise holding of the Supreme Court in *Ramos.* Footnote 8 of Justice O'Connor's opinion makes this point irrefutable. Even if the prosecutor had asked the jury to consider the Governor's commutation power, no federal Constitutional right would have been implicated.

Nevertheless, it is not true, as the majority opinion claims, that "the jury was invited to speculate that the only way it could avoid Hamilton's likely release was to sentence him to death." On this point, I respectfully believe the majority opinion simply refuses to acknowledge the full language of the charge.

### D.

There is an aspect of this case that may escape my colleagues' understanding. As Justice Richardson observed in his dissent in *People v. Ramos,* 30 Cal.3d 553, 180 Cal. Rptr. 266, 639 P.2d 908 (1982), *rev'd,* 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983), "jurors already know of the commutation power." *Id.,* 30 Cal.3d at 604, 180 Cal.Rptr. 266, 639 P.2d 908 (Richardson, J., dissenting). This observation was reiterated by Justice O'Connor in *California v. Ramos,* 463 U.S. 992, 996 n. 6, 1004 n. 19, 103 S.Ct. 3446,

3451 n. 6, 3455 n. 19, 77 L.Ed.2d 1171 (1983). This perception of public awareness about commutation is both accurate and important in understanding the pivotal issue in this case, and it distinguishes this case from *Bruton,* where the concern was related to confessions and admissions, not matters of common knowledge.

The commutation power was the subject of great public debate in California during the late 1970s, a debate that culminated in a 1978 voter death penalty initiative popularly known as the Briggs Initiative. What happened in this case is simple: the jurors were appropriately told not to consider something they probably all knew about, the Governor's power to alter a murderer's sentence. The trial judge, in an apparent attempt to eliminate possible trouble on appeal, wisely tried to eliminate the commutation factor from consideration. This admonition is akin to telling jurors not to use information they may have read in the newspapers in arriving at a verdict, an admonition that occurs daily in our courts. Contrary to the approach taken by the majority here, no one could seriously argue that such an admonition about media publicity invites the jurors to do what they are told not to do. Yet in this context such an argument carries the day.

To reiterate, I agree with the California Supreme Court's bottom-line conclusion: *Any* problems with the substance of this instruction were erased by its admonitory component.

### E.

There is a strong indicator that my analysis is correct: Hamilton's counsel *consented* to the instruction and suggested much of its language. Judge Brewster entered a finding of fact that "the parties reached an agreement on a modified Briggs Instruction." *Hamilton,* at 77 (order denying petitions for writ of habeas corpus). The majority opinion admits this fact but ignores its implications. It is difficult to conclude from this record that *Hamilton's counsel,* who was on the scene and familiar with the case and the evidence, could have believed this instruction would prevent the jury from giving a rea-

soned moral response to petitioner's mitigating evidence, *see Perry v. Lynaugh,* 492 U.S. 302, 319, 109 S.Ct. 2934, 2947, 106 L.Ed.2d 256 (1989), or that the instruction would create the risk the death penalty would be imposed despite evidence which would call for a life sentence, *see Lockett v. Ohio,* 438 U.S. 586, 605, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973 (1978). Why is it so clear to the majority that this instruction spelled doom for Hamilton when it was acceptable to his attorney? This question almost answers itself. The instruction was not threatening to those present at the trial because, and I repeat, the jury was told *not* to consider the information which is now causing all the trouble. Hamilton's counsel's performance in this case was extraordinary. In his findings of facts, Judge Brewster adopted the trial judge's observation: "Mr. Ryan did an excellent job in a most difficult case with a very, very difficult client." *Hamilton,* at 41 (order denying petitions for writ of habeas corpus). The trial judge and the trial lawyers were comfortable with the idea that the jurors would do as told. This should tell us something.

### F.

The majority opinion persistently does what *Boyde* tells us not to do: it speculates at every turn. Moreover, the conclusions the majority draws from its speculation are patently inconsistent with the evidentiary dimensions of the case. The opinion says, "[t]he jury spent three days deliberating in the penalty phase, suggesting that the California jury saw this as a close case." Why so? Why doesn't the length of deliberations suggest the jurors were conscientious and careful and that they followed the instructions as a whole rather than jumping to a rash conclusion? Why doesn't it suggest the jurors *did* consider the seven mitigating witnesses called by Hamilton?

A close case? Each juror was convinced beyond a reasonable doubt that death was the proper penalty. This hardly sounds like a close case. Any time twelve jurors each agree on an issue, and do so beyond a reasonable doubt, it "suggests" the prosecutor's case was overwhelming. This is surely so in

the light of all the evidence in the record, especially the atrocities Hamilton committed upon Mrs. Eleanore Buchanan, who was still nursing the baby boy to whom she had given birth just three weeks before Hamilton slaughtered her. Mrs. Buchanan's severed head and hands—removed with both a saw and a knife—have never been found. The terror she must have suffered after being kidnapped and falling prey to Hamilton is unspeakable. Even to the most hard-bitten observer, Hamilton's atrocities as demonstrated in the record are monstrous. Against this backdrop, the weak mitigating evidence cited by the majority fades into utter insignificance. In actuality, however, it is impossible for us to know what three days of deliberations signifies, if anything. Thus, I would prefer to ignore altogether the length of the deliberations, rather than use it as the basis for what appears to be a makeweight argument.

### Conclusion

Applying *Ramos, Boyde* and *Bruton* to this case and to the charge to the jury as a whole convinces me that Hamilton's federal Constitutional rights were not trammelled by the disputed instruction. The majority's opinion fails to heed the Supreme Court's lead in *Ramos.* In particular, I point to the Supreme Court's statement that "we find unpersuasive the suggestion that the possible commutation of a life sentence must be held constitutionally irrelevant to the sentencing decision and that it is too speculative an element for the jury's consideration." *Ramos,* 463 U.S. at 1001–02, 103 S.Ct. at 3453–54. All the majority opinion has succeeded in doing is to show what *could have* done with the disputed instruction, *not* that the "jury *has applied* the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde,* 494 U.S. at 380, 110 S.Ct. at 1198 (emphasis added). As I pointed out earlier in this opinion, the "could have" test has been soundly rejected by the Supreme Court.

It is both unnecessary and wrong to use the power of federal habeas corpus to require this case again to go to trial fourteen years after Eleanore Buchanan was butchered.

Hamilton was entitled to a fair trial, not a perfect one: he got that to which he was entitled. The record convinces me there is no reasonable likelihood the jury applied the challenged instruction in a way that interfered with a Constitutionally proper determination of his penalty. The conclusion of the California Supreme Court on this point is unassailable. Put another way, even assuming actionable error, I do not believe it " ' "had substantial and injurious effect or influence in determining the jury's verdict." ' " *Brecht v. Abrahamson,* —— U.S. ——, ——, 113 S.Ct. 1710, 1716, 123 L.Ed.2d 353 (1993) (citations omitted). Hamilton earned this penalty based on (1) his barbaric conduct, (2) the extreme weight of the aggravating factors, and (3) the insignificance of the mitigating factors in his favor. Thus, I respectfully dissent from that part of the majority's opinion overturning his sentence.

### Appendix

The complete charge to the jury in the penalty phase:

> The Court: All right. Ladies and gentlemen, at this time I have the instructions for the second phase of these proceedings.
>
> The defendant in this case has been found guilty of murder of the first degree. The charge that the murder was committed under special circumstances has been found to be true. It is the law of this state that the penalty for a defendant found guilty of murder of the first degree shall be death or confinement in the state prison for life without possibility of parole. In any case in which the special circumstances charged in this case have been found to be true. Under the law of this state you must now determine which of said penalties shall be imposed on defendant. In determining which penalty is to be imposed on the defendant, you shall consider all of the evidence which has been received during any part of the trial of this case. You shall take into account and be guided by the following factors, if applicable:.
>
> A. The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true.
>
> B. The presence or absence of criminal activity by the defendant which involves the use or attempted use of force or violence or the expressed or implied threat to use force or violence.
>
> C. The presence or absence of any prior felony conviction.
>
> D. Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.
>
> E. Whether or not the victim was a participant in the defendant's homicidal conduct or consented to the homicidal act.
>
> F. Whether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or expectation for his own conduct.
>
> G. Whether or not the defendant acted under extreme duress or under the substantial domination of another person.
>
> H. Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or the affects [sic] of intoxication.
>
> I. The age of the defendant at the time of the crime.
>
> J. Whether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor.
>
> K. Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime.
>
> In weighing the aggravating and mitigating factors you are not to merely count numbers on either side. You are instructed rather to weigh and consider the factors on each side as a whole.
>
> I have previously read to you the list of aggravating circumstances which the law permits you to consider if you find that any of them is established by the evidence. These are the only aggravating circum-

stances that you may consider. You are not allowed to take account of any other facts or circumstances as a basis for deciding that the death penalty would be an appropriate punishment in this case.

The mitigating circumstances which I have read for your consideration are given to you merely as examples of some of the factors that you may take into account as reasons for deciding not to impose a death sentence on Mr. Hamilton. But you should not limit your consideration of mitigating circumstances to these specific factors. You may also consider any other circumstances presented as reasons for not imposing the death penalty. Before you consider any fact as an aggravating circumstance, you must find that that fact has been established by the evidence beyond a reasonable doubt. You may not consider any fact as a reason for choosing to impose the death sentence unless you are satisfied beyond a reasonable doubt and to all certainty that that fact is true.

Reasonable doubt is defined as follows: it is not a mere possible doubt because everything relating to human affairs and depending on moral evidence is open to some possible or imaginary doubt.

It is that state of the case which, after the entire comparison and consideration of all the evidence leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction to a moral certainty of the truth of the charge.

In order to impose a death sentence, you must be convinced beyond a reasonable doubt that the totality of the aggravating circumstances outweigh the totality of the mitigating circumstances. If you are not convinced beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances, you must return a verdict of life imprisonment without possibility of parole.

The next couple of instructions deal with robbery and battery, since there was evidence of robbery and battery in the penalty phase of the trial, and so I will give you the definitions of these offenses.

The crime of robbery is the taking of personal property in the possession of another from his person or immediate presence and against his will, accomplished by means of force and fear.

In order to prove the commission of the crime of robbery, each of the following elements must be proved: one, that a person had possession of property of some value, however slight; two, that such property was taken from such person or from his immediate presence; three that such property was taken against the will of such person; four, that the taking was accomplished either by force or violence or by fear or intimidation or by both, and five, that such property was taken with the specific intent permanently to deprive such person of the property.

Now, relative to the subject of battery, every person who willfully and unlawfully uses any force or violence upon the person of another is guilty of battery, a misdemeanor. As used in the foregoing instruction, the words "force" and "violence," are synonymous and mean any wrongful application or [sic] physical force against the person of another, even though it causes no pain or bodily harm or leaves no mark, and even though only the feelings of such person are injured by the act.

The slightest unlawful touching, if done in an insolent, rude or an angry manner, is sufficient.

It is not necessary that the touching be done in actual anger or with actual malice. It is sufficient if it was unwarranted and unjustifiable.

The touching essential to a battery may be a touching of the person, or the person's wearing apparel or of something attached to or closely connected with the person.

It is now your duty to determine which of the two penalties, death or confinement in the state prison for life without possibility of parole shall be imposed on Mr. Hamilton.

You are instructed that under the state constitution, a governor is empowered to grant a reprieve, pardon or commutation of a sentence following conviction of a

crime. Under this power, a governor may, in the future, commute or modify a sentence of life imprisonment without possibility of parole to a lesser sentence that would include the possibility of parole.

This is subject to the requirement that in the case of any person twice convicted of a felony, a commutation or modification may not be granted absent the written recommendation of at least four justices of the California Supreme Court. Further, a life sentence requires a minimum incarceration of 25 years, less one-third off for good time credit before parole may be considered by the proper authorities.

You are now instructed, however, that the matter of a possible commutation or modification of sentence is not to be considered by you in determining the punishment for Mr. Hamilton. You must not speculate as to whether such commutation or modification would ever occur.

It is not your function to decide now whether this man will be suitable for parole at some future date. So far as you are concerned, you are to decide only whether this man shall suffer the death penalty or whether he shall be permitted to remain alive.

If upon consideration of the evidence you believe that life imprisonment without possibility of parole is the proper sentence, you must assume that the governor, the Supreme Court and those officials charged with the operation of our parole system will perform their duty in a correct and responsible manner, and that Mr. Hamilton will not be paroled unless he can be safely released into society.

It would be a violation of your duty as jurors if you were to fix the penalty at death because of the doubt that the governor and other officials will properly carry out their responsibilities.

After having heard all of the evidence and after having heard and consider [sic] the arguments of counsel, you shall consider and take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed.

If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death. However, if you determine that the mitigating circumstances outweigh the aggravating circumstances, you shall impose a sentence of confinement in the state prison for life without possibility of parole.

You shall now retire and select one of your number to act as foreman, who will preside over your deliberations.

In order to make a determination as to the penalty, all jurors must agree.

Any verdict that you reach must be dated and signed by your foreman on a form that will be provided, and then you shall return with it to this courtroom.

I have two forms which are self-explanatory. One form would provide the penalty would be fixed at death, the other form provides for a penalty of life imprisonment without possibility of parole, and when you have reached a verdict, when all 12 of you have reached a verdict, have the foreman sign and date the verdict and return to this courtroom.