689 So.2d 1321 (1997)
STATE of Louisiana
v.
Alvin Scott LOYD.
No. 96-KK-1805.
Supreme Court of Louisiana.
February 13, 1997.
*1322 Clive Adrian Stafford Smith, Carol A. Kolinchak, New Orleans, for Applicant.
Richard Phillip Ieyoub, Attorney General, John M. Crum, Jr., Laplace, Julie E. Cullen, Donald Albert Rowan, Jr., Baton Rouge, for Respondent.
John Wilson Rambo, Monroe, for Louisiana Public Defense Association, Amicus Curiae.
*1323 Marilyn Michele Fournet, Baton Rouge, J. Michael Small, Camille F. Gravel, Jr., Alexandria, for Yvonne Campbell, Amicus Curiae.
Timothy Allison Meche, New Orleans, for Louisiana Criminal Defense Lawyers, Amicus Curiae.
Anthony Modesto Bertucci, Baton Rouge, for Murray Henderson Warden, Amicus Curiae.
JOHNSON, Justice.[*]
The court granted relator's pre-trial application to review the judgment of the Fifth Circuit vacating the trial judge's decision that, based on constitutional grounds, he will not give the commutation instruction mandated by La.C.Cr.P. art. 905.2(B) to the jury at relator's forthcoming penalty phase trial, the third such proceeding he has faced. Relator argues that La.C.Cr.P. art. 905.2(B) cannot be retroactively applied to him and that the article violates both the state and federal constitutions. We granted the writ application to review the correctness of the lower court rulings.

Facts
In 1983, Alvin Scott Loyd was convicted of the first degree murder of Brandi Renee Giovanetti and sentenced to death. The facts of this case, set forth in prior opinions of this Court, can be summarized as follows:
In April, 1981, Loyd gave three-year-old Brandi and her mother a ride home from a local fair in St. John the Baptist Parish. When he arrived at their house he asked to come inside. Brandi's mother refused, stepping out of his truck, and Loyd sped off with her daughter still in the cab. Loyd was picked up later by the police and interrogated. He confessed to abducting the toddler, raping her, drowning her in a ditch, and dumping her by the roadside. He led the police to her body, which was partially covered by leaves and was clad in only a pair of tennis shoes.
On appeal, Loyd's conviction was affirmed, but this court reversed his sentence. State v. Loyd, 459 So.2d 498 (La.1984). On May 6, 1985, a second jury imposed a death sentence. This court affirmed his second death sentence. State v. Loyd, 489 So.2d 898 (La. 1986), cert. denied, 481 U.S. 1042, 107 S.Ct. 1984, 95 L.Ed.2d 823, rehearing denied, 483 U.S. 1011, 107 S.Ct. 3244, 97 L.Ed.2d 749 (1987). Then, in 1992, following denials of relief from lower state courts, this court, and the federal district court, the United States Court of Appeals for the Fifth Circuit reversed his sentence. Loyd v. Whitley, 977 F.2d 149 (5th Cir.1992)(counsel rendered ineffective assistance by failing to develop and present substantial mitigating evidence regarding the defendant's mental defects and abnormalities). During the pendency of this, his third penalty phase trial, the trial court ordered that the instruction mandated by La.C.Cr.P. art. 905.2(B) not be given because the article could not be applied retroactively under the state and federal due process clauses and because the article violated federal due process rights. The Fifth Circuit reversed, finding that the trial court erred in holding the article to be unconstitutional. State v. Loyd, 459 So.2d 498 (La.App. 5th Cir. 6/21/96).
In this application, the defendant seeks a ruling from this court on the propriety of this use of the commutation instruction. The defendant principally argues that the instruction violates federal due process rights and protections against ex post facto laws.

Background
Defendant argues that under the ex post facto clauses of the state and federal constitutions, La.C.Cr.P. art. 905.2(B) cannot be applied to offenses committed before its enactment because the article operates to the substantial disadvantage of the defendant by inciting the jury to return a sentence of death. Defendant maintains that the instruction should not be given at his trial because he committed the offense more than ten years before the article was enacted.
In ruling that it would not give the instruction, the trial court found La.C.Cr.P. art. 905.2(B), originally enacted by 1993 La. Acts No. 436, violative of La. Const. art. I, §§ 2 and 20 (the Due Process and Inhumane Treatment Clauses). State v. Jones, 94-0459 (La.7/5/94), 639 So.2d 1144. Although the *1324 Jones decision overturned the original enactment of this article, the state constitution has been amended to allow for such a provision. See, 1995 La. Acts No. 1322.[1] Concurrent with the adoption of this constitutional amendment, La.C.Cr.P. art. 905.2(B) has been reintroduced and is now law. Article 905.2(B) prescribes:
Notwithstanding any provision to the contrary, the court shall instruct the jury that under the provisions of the state constitution, the governor is empowered to grant a reprieve, pardon, or commutation of sentence following conviction of a crime, and the governor may, in exercising such authority, commute or modify a sentence of life imprisonment without benefit of parole to a lesser sentence including the possibility of parole, and may commute a sentence of death to a lesser sentence of life imprisonment without benefit of parole. The court shall also instruct the jury that under this authority the governor may allow the release of an offender either by reducing a life imprisonment or death sentence to the time already served by the offender or by granting the offender a pardon. The defense may argue or present evidence to the jury on the frequency and extent of use by the governor of his authority.
1995 La. Acts No. 551, § 1.

Law and Analysis

I. Ex Post Facto

A. Federal Ex Post Facto Clause
Article I, § 10 of the Constitution forbids the States from passing any "ex post facto Law." California Department of Corrections, et al v. Morales, 514 U.S. 499, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995). The Ex Post Facto Clause is aimed at laws that "retroactively alter the definition of crimes or increase the punishment for criminal acts." California Department of Corrections, et al at ___, 115 S.Ct. at 1600, citing Collins v. Youngblood, 497 U.S. 37, 41, 110 S.Ct. 2715, 2718, 111 L.Ed.2d 30 (1990). In Collins v. Youngblood, 497 U.S. 37, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990), the Court narrowed the scope of the Ex Post Facto Clause's application and returned to the traditional understanding of the Ex Post Facto clause as set forth in Calder v. Bull, 3 U.S. 386 3 Dall. 386, 1 L.Ed. 648 (1798). In doing so, the Court overruled Kring v. Missouri, 107 U.S. 221, 2 S.Ct. 443, 27 L.Ed. 506 (1883) and Thompson v. Utah, 170 U.S. 343, 18 S.Ct. 620, 42 L.Ed. 1061 (1898), two cases espousing a more expansive reading of the Ex Post Facto Clause.
The Collins Court held that the prohibition against ex post facto laws precludes the state from (1) punishing as a crime previously innocent conduct, (2) increasing punishment after the commission of the crime, or (3) depriving the defendant of a defense available at the time of the commission of the crime. Collins, 497 U.S. at 41-43, 110 S.Ct. at 2719, citing Beazell v. Ohio, 269 U.S. 167, 46 S.Ct. 68, 70 L.Ed. 216 (1925).[2]
The competing ex post facto analysis set forth in Kring, expansively defined an ex post facto law as one which "in relation to the *1325 offence or its consequences, alters the situation of a party to his disadvantage." 107 U.S. at 227-29, 2 S.Ct. at 449. The Court found that the amorphous Kring test had no place among Calder and its progeny. Thus, to be prohibited as an ex post facto law, a measure must be more than simply a retrospective law which alters a defendant's situation to his disadvantage. Collins, 497 U.S. at 48-51, 110 S.Ct. at 2723.
La.C.Cr.P. art. 905.2(B) does not change the definition of the offense of first degree murder, nor does it deprive relator of any defenses. Thus, the only question remaining is whether this instruction acts to increase the punishment for the offense. Relator argues that it does increase the punishment by influencing the jury to vote in favor of death. He avers that this was the intent behind the enactment of this measure. As evidence of this purpose, he notes that the Louisiana District Attorneys Association supported the amendment to La.C.Cr.P. art. 905.2. He also cites a study done in connection with State v. Durham, 94-0535 (La.3/11/94), 634 So.2d 838, in which survey respondents indicated that jurors would be more likely to vote for death after hearing this instruction.
In California Dept. of Corrections v. Morales, 514 U.S. 499, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995), the Court reaffirmed the holding in Collins and described what retrospective changes in punishment implicate the Ex Post Facto Clause. At the time the defendant in Morales committed his offense, California law required that parole hearings be held on an annual basis. However, the legislature later amended the statute in question to allow the parole board to defer hearings for up to three years. The defendant argued that the amendment created a retroactive increase in punishment, because it extended the time he would be imprisoned awaiting a parole hearing, thus violating the Ex Post Facto Clause. Id. at ___, 115 S.Ct. at 1600.
The Court rejected that contention, finding that the new law did not change the punishment for the offense. The term of his sentence was left untouched and the formulas for determining any reductions in his sentence were left unchanged. Allowing the board to defer parole hearings merely altered the procedure by which parole release dates are fixed; it did not increase the prescribed length of the defendant's sentence or any criteria by which the term of imprisonment might be reduced after conviction. Thus, the Court emphasized the distinction between actual changes in the "quantum of punishment" as opposed to changes in sentencing procedures which only have the possible effect of increasing the severity of punishment. A law may create the likelihood that a sentence may be longer without affecting the punishment in a way that implicates the Ex Post Facto Clause. Id. at ___, 115 S.Ct. at 1601-02.
In Morales, the Court disapproved of the defendant's contention that the Ex Post Facto Clause forbids any legislative change which runs the risk of affecting a prisoner's punishment. Id. at ___, 115 S.Ct. at 1602. To evaluate the constitutionality of a law with retroactive effect, the Court examines whether the law "produces a sufficient risk of increasing the measure of punishment...." Id. at ___, 115 S.Ct. at 1603. However, the Morales court noted that the amendment altering the timing of parole hearings
creates only the most speculative and attenuated possibility of producing the prohibited effect of increasing the measure of punishment for covered crimes, and such conjectural effects are insufficient under any threshold we might establish under the Ex Post Facto Clause. Id.

This Court echoed this rationale in Glover, noting that limiting the time under La. C.Cr.P. art. 930.8 for filing post-conviction applications "only has a speculative or attenuated risk of affecting a prisoner's actual term of confinement, and is not an increase in punishment." Glover, 660 So.2d 1189, 1201 n. 14
*1326 Therefore, only those laws which have the direct effect of retroactively increasing the severity of punishment have been held to be violative of the Ex Post Facto Clause. See, Miller v. Florida, 482 U.S. 423, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987) (after crime was committed, but before defendant was sentenced, the legislature altered the formula for calculating the "presumptive sentencing range" increasing the range from 3 1/2 to 4 1/2 to 5 1/2 to 7; this increase was an ex post facto law); Weaver v. Graham, 450 U.S. 24, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981) (application of new formula for calculating "gain time" credits that increased term of imprisonment for previously sentenced prisoner violated Ex Post Facto Clause); Lindsey v. Washington, 301 U.S. 397, 400-02, 57 S.Ct. 797, 799, 81 L.Ed. 1182 (1937) (statute in effect at time of offense that prescribed a sentence of "not more than fifteen years" was changed before defendants were sentenced to require a sentence of fifteen years; because "the measure of punishment prescribed by the later statute was more severe than that of the earlier," the measure was an ex post facto law). However, retrospective measures which only have an attenuated relationship with an increase in the severity of punishment are not ex post facto laws. See, Morales, 514 U.S. at ___, 115 S.Ct. at 1603; Dobbert v. Florida, 432 U.S. 282, 292-94, 97 S.Ct. 2290, 2298, 53 L.Ed.2d 344 (1977) (a statute that merely "altered the methods employed in determining whether the death penalty should be imposed," but does not change the "quantum of punishment" does not violate the Ex Post Facto Clause).
While the conclusion that the commutation instruction may result in a harsher sentence for the defendant may appeal to a common sense view of the instruction's intended effect, given the sponsorship by the District Attorney's Association, it is nonetheless still grounded in speculation. The relationship between the operation of this article and an increase in punishment is too attenuated for La.C.Cr.P. art. 905.2(B) to be considered an ex post facto law. Therefore, delivering the instruction at relator's trial would not offend the federal Ex Post Facto Clause.

B. State Ex Post Facto Clause
Although the United States Supreme Court limited the federal Ex Post Facto Clause in Collins, this court, with respect to the Louisiana Ex Post Facto Clause, stated in State ex rel. Glover, 93-2330 (La.9/5/95), 660 So.2d 1189, 1200, that an ex post facto law is one passed "after the commission of an offense which in relation to that offense or its punishment alters the situation of a party to his disadvantage."[3] Therefore, to qualify under Glover as an ex post facto law, the suspect legislation: (1) must be passed after the date of the offense, (2) must relate to the offense or its punishment, and (3) must alter the situation of the accused to his disadvantage. Id. Moreover, while the States are free to provide greater protections in their criminal justice system than the Federal Constitution, this court has not yet addressed the question of whether, in light of Collins, the Ex Post Facto Clause of the Louisiana Constitution will be interpreted to provide broader protection than that of the federal constitution. Id. at 1201 n. 15. However, we do not need to decide that issue in this case because the commutation statute does not relate to the offense or its punishment.
This court's examination of another facet of penalty phase jury instructions is helpful. In State v. Jordan, 440 So.2d 716 (La.1983), while the defendant was awaiting his penalty phase retrial, the legislature added another aggravating circumstance to La.C.Cr.P. art. 905.4(c), which provided that the jury was to consider whether the defendant had "a *1327 significant prior history of criminal activity." Because the presence of aggravating factors determines whether a defendant can be sentenced to death, the Jordan court found that the application of the new aggravating factor would constitute an ex post facto law. The court explained:
By the addition of this aggravating factor, this defendant is now exposed to the death penalty whereas, factually, prior to the commission of this murder, he was not so exposed. This change is ex post facto. Jordan, 440 So.2d at 718.
Even though the addition of an aggravating factor and the commutation instruction both arguably make the rendering of a death verdict more likely, these two measures are actually quite different. To reach a verdict of death, the jury must find the presence of at least one statutorily enumerated aggravating factor. La.C.Cr.P. art 905.3. The addition of another aggravating circumstance is the functional equivalent, with respect to the penalty, of adding an additional element to the offense. Therefore, under the Louisiana formulation of the ex post facto test, an aggravating factor clearly relates to the punishment of the offense. However, the connection between the commutation instruction and punishment is not so direct.
Even if it can be said that the instruction influences the jury to vote for death, it does not relate to the punishment of the offense in the manner set forth in case law. The addition of an aggravating factor clearly relates to the punishment of the offense because it provides another ground for the jury to return a death verdict. However, La.C.Cr.P. art. 905.2(B) adds nothing to the substantive definition of the crime and does not increase the prescribed penalty. The commutation instruction is simply a statement of law which does not change the elements of the offense or the amount of its punishment. Therefore, the retroactive application of La. C.Cr.P. art. 905.2(B) is not considered ex post facto, as was the new law in Jordan. See also, State v. Bodenheimer, 95-861 (La. App. 5th Cir. 11/28/95), 665 So.2d 608, 611, writ denied, 95-3011 (La.2/9/96), 667 So.2d 539 (change in law concerning the dismissal of misdemeanor prosecutions did not offend the Ex Post Facto Clauses of either the federal or state constitutions where the article was not part of the penalty provision of any criminal statute, but formed part of the provisions governing the suspensions of sentences in misdemeanor cases).
Notwithstanding the statistical surveys and common sense arguments which purport to show that the commutation instruction makes juries more likely to return a death verdict, the defendant fails to demonstrate conclusively that the application of La. C.Cr.P. art. 905.2(B) actually places him at a disadvantage with regard to the offense or its punishment. Like the provision in Glover, the commutation instruction "only has a speculative or attenuated risk of affecting a prisoner's actual term of confinement, and is not an increase in punishment." 660 So.2d 1189, 1201 n. 14. Therefore, La.C.Cr.P. art. 905.2(B) does not relate to the punishment for the offense, and the retroactive application of the law does not offend the Louisiana Ex Post Facto Clause.
Defendant further maintains that this court can decide the issue of the retroactive application of La.C.Cr.P. art. 905.2(B) on the well-settled principles of statutory interpretation, pretermitting the need for constitutional analysis. He initially observes that La.R.S. 1:2 provides that "[n]o section of the Revised Statutes is retroactive unless it is expressly so stated." In support of this rule, he notes that the United States Supreme Court has held that there is a presumption against retroactivity, unless legislative intent is clearly expressed otherwise. Landgraf v. USI Film Products, 511 U.S. 244, 272, 114 S.Ct. 1483, 1501, 128 L.Ed.2d 229 (1994). Because there is no express retroactivity provision within La.C.Cr.P. art. 905.2(B), he maintains that the article should not be applied to offenses committed before its enactment.
However, the Court's conclusions in Landgraf are not squarely on point since that opinion primarily concerns civil matters. While the jurisprudence treating the retrospective application of civil and criminal laws has developed along the same general lines, the retroactivity of penal legislation is more appropriately addressed under an ex post *1328 facto analysis. U.S. Const. art. I, § 10, Landgraf, 511 U.S. at 265-66, 114 S.Ct. at 1497. Because 905.2(B) concerns criminal matters only, the question of its retrospective operation hinges on whether the article is a prohibited ex post facto law.
In any event, notwithstanding the presumption against retroactivity, the Landgraf court stated that in civil cases, changes in procedural rules may often be applied in suits arising before their enactment without raising concerns about their retroactivity. Id., 511 U.S. at 274, 114 S.Ct. at 1502. In the criminal context, the Court noted specifically that while it has "strictly construed the Ex Post Facto Clause to prohibit application of new statutes creating or increasing punishments after the fact, [it has] upheld intervening procedural changes even if application of the new rule operated to a defendant's disadvantage in the particular case." Landgraf, 511 U.S. at 274 n. 28, 114 S.Ct. at 1502 n. 28. When dealing with criminal (as well as civil) procedural rules, the Court applies the "common-sense notion" that the applicability of procedural changes depends on the posture of the case. Id., 511 U.S. at 275 n. 29, 114 S.Ct. at 1502 n. 29. For example, a new rule governing the filing of complaints would not govern an action in which a complaint had already been filed. Id. Therefore, because La.C.Cr.P. art. 905.2(B) does not run afoul of the Ex Post Facto Clause, the measure may be properly utilized in defendant's trial, assuming it is constitutional in all other respects. See State v. Sepulvado, 342 So.2d 630 (La.1977) (change in procedural rules made after the commission of the offense, but before trial commenced, may be employed at trial as long as it is not an ex post facto law).

II. Constitutionality of La.C.Cr.P. art. 905.2(B)

A. La.C.Cr.P. art. 905.2(B) does not violate Eighth Amendment prohibition of the use of mitigating evidence as an aggravating circumstance
The defendant also argues that the commutation instruction is unconstitutional because it allows a jury to impose a death sentence based on factors that should be considered in mitigation. Citing common sense and testimony from a pardon board member, defendant maintains that an accused, such as himself, who has spent a significant length time in prison and has successfully adapted to prison life, is more likely to receive a pardon or commutation. On the other hand, he notes that juries are more likely to impose a death sentence after hearing the commutation instruction. Therefore, he concludes that the likelihood of executive clemency, which should act as a mitigating factor, in fact, operates as an aggravating circumstance. He contends that the commutation instruction forces the jury to consider evidence of the defendant's propensity for rehabilitation as an aggravating factor, rather than as a mitigating one, in violation of the Eighth Amendment. See, Penry v. Lynaugh, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (Texas death penalty scheme held unconstitutional to the extent that the defendant's history of mental illness, a factor traditionally viewed as mitigating evidence, was considered in aggravation, rather than mitigation); Zant v. Stephens, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983).
However, defendant's reliance on the Penry and Zant cases is baseless. The instruction in the instant case does not concern itself with the statutory list of aggravating and mitigating factors as in Penry. The Penry rationale is also inapposite because the instruction does not relate to the jury any information personal to the defendant, which could be used as an aggravating or mitigating factor. The instruction does not incorporate any references to the defendant's character or his potential for rehabilitation.
Defendant has been in jail since April, 1981. He states that he has been an exemplary inmate on death row, and intends to present evidence of his adaptation to prison life at his new penalty trial. Defendant claims that after hearing evidence of his good behavior, the jury will be more likely to impose a death sentence to prevent defendant from ever getting out of prison. La. C.Cr.P. art. 905.2(B) authorizes the introduction of evidence by the defense concerning the "frequency and extent of use by the *1329 governor of his authority," but nowhere does it allow for speculation at trial concerning a defendant's suitability for clemency or the likelihood that a particular defendant will receive a pardon or commutation.
Under the scheme set up under La.C.Cr.P. art. 905.2(B), the jury will only be given a neutral statement of the law concerning the governor's authority to commute a sentence or pardon an offense. The jury will not receive any information concerning the particular characteristics of the offender in relation to the likelihood of his future release. Therefore, the risk of affecting the balance between mitigating and aggravating factors will be minimized.
In any case, the United States Supreme Court has stated that this instruction does not interfere with the jury's duty to weigh aggravating and mitigating factors:
Consideration of the commutation power does not undermine the jury's statutory responsibility to weigh aggravating factors against mitigating factors and impose death only if the former outweigh the latter. The desirability of the defendant's release into society is simply one matter that enters into the weighing process. Moreover, the fact that the jury is given no specific guidance on how the commutation factor is to figure into its determination presents no constitutional problem. California v. Ramos, 463 U.S. 992, 1008 n. 22, 103 S.Ct. 3446, 3457 n. 22, 77 L.Ed.2d 1171 (1983).
The commutation instruction is simply a statement of law concerning executive clemency. It is not styled as, nor can it be confused with, the statutory aggravating circumstances as listed in La.C.Cr.P. art. 905.4. Furthermore, the instruction in La.C.Cr.P. art. 905.2(B) does not concern itself with the particulars of the defendant's behavior; it merely informs the jury of the existence of the governor's pardon power. Clearly, the concerns that the instruction will operate as some sort of ersatz aggravating factor are unfounded.

B. The commutation statute does not violate federal due process guarantees.
Defendant expounds on Justice Kimball's concurrence in Jones, arguing that the instruction mandated by La.C.Cr.P. art. 905.2(B) violates federal due process guarantees.[4] Although the U.S. Supreme Court appears to approve of the commutation instruction in Ramos, 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171, he contends that subsequent jurisprudential developments since Ramos indicate that the Court no longer approves of such instruction. In addition, he argues that the instruction here is different from the "Briggs Instruction" approved in Ramos and thus cannot withstand constitutional scrutiny under the Ramos analytical framework.
First, the defendant contends that the question of the commutation instruction's federal constitutionality has been long settled as a matter of Louisiana law. Citing the long line of decisions beginning with State v. Lindsey, 404 So.2d 466, cert. denied, 464 U.S. 908, 104 S.Ct. 261, 78 L.Ed.2d 246, (1983) and culminating in Jones, he argues that this court has consistently held that this instruction violates federal due process guarantees. However, with the exception of Justice Kimball's concurrence in Jones, neither Lindsey nor Jones delves into questions of federal constitutional law concerning this instruction. In fact, the Jones court noted that Ramos approved of a similar instruction, but emphasized that Ramos deferred to the states to *1330 determine whether the instruction was appropriate.
Likewise, he contends that our sister states uniformly hold that this instruction violates the federal Constitution. However, a review of the jurisprudence cited in his brief reveals that these cases were all decided before Ramos. In any event, the interpretation of the federal Constitution by the high courts of our sister states, while persuasive, is not controlling given the unequivocal holding in Ramos that such instruction is not prohibited under the federal Constitution. The majority opinion in Ramos freely acknowledged that the vast majority of states with the death penalty, including Louisiana, had condemned instructions on the Governor's power to commute life sentences. Ramos, 463 U.S. at 1014 n. 30, 103 S.Ct. at 3460 & n. 30. In fact, the dissenters (Marshall, Brennan, Stevens and Blackmun, JJ.) could not find any other state which sanctioned the instruction by statute, 463 U.S. at 1026 n. 12, 103 S.Ct. at 3466 n. 12 (Marshall, J., dissenting), and only three state court decisions approving of the practice. Id. at 1027 & ns. 14 and 15, 103 S.Ct. at 3467 & ns. 14 and 15 (citing State v. Jackson, 100 Ariz. 91, 412 P.2d 36 (1966); Brewer v. State, 275 Ind. 338, 417 N.E.2d 889 (1981); and Massa v. State, 37 Ohio App. 532, 175 N.E. 219 (1930)). On the other hand, twenty-five states had explicitly prohibited discussion of pardon and commutation at a capital sentencing hearing. Ramos, 463 U.S. at 1027 n. 13, 103 S.Ct. at 3466 n. 13. Notwithstanding the overwhelming weight of contrary opinion, the majority emphatically stated that there existed no federal constitutional prohibition to the Briggs Instruction, but that:
Our decision is not intended to override the contrary judgment of state legislatures that capital sentencing juries in their States should not be permitted to consider the Governor's power to commute a sentence. It is elementary that States are free to provide greater protections in their criminal justice system than the Federal Constitution requires. We sit as judges, not as legislators, and the wisdom of the decision to permit juror consideration of possible commutation is best left to the States. Id. at 1013-15, 103 S.Ct. at 3460.
Notwithstanding the jurisprudence in any other state, Ramos rules out any possible federal limitation on the power of Louisiana to manipulate its constitutional and statutory law with respect to this instruction.
Ramos considered the Eighth and Fourteenth Amendment implications of California's so-called Briggs Instruction, required by the state's capital sentencing law, which informed jurors that the Governor's power of commutation gave him the authority to "commute or modify a sentence of life imprisonment without possibility of parole to a lesser sentence that would include the possibility of parole."[5] The California Supreme Court struck down the Briggs Instruction on federal constitutional grounds because it deflected the jury's consideration of the defendant's character and the circumstances of the particular offense and interjected a wholly speculative element into the sentencing process. The court also held that the instruction's failure to inform jurors evenhandedly that the governor could also commute a death sentence left jurors with the mistaken impression that only a capital sentence could keep the defendant off the streets Ramos, 463 U.S. at 994-98, 103 S.Ct. at 3450-51.
In a five to four decision, the Ramos court found unpersuasive "the suggestion that the possible commutation of a life sentence must be held constitutionally irrelevant to the sentencing decision and that it is too speculative an element for the jury's consideration." 463 U.S. at 1001-03, 103 S.Ct. at 3454. The Court had previously upheld the Texas capital sentencing scheme which made the defendant's future dangerousness one of three relevant statutory considerations. Jurek v. Texas, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). To the majority in Ramos, the Briggs Instruction simply "invit[ed] the jury to assess whether the defendant is someone whose probable future behavior makes it undesirable that he be permitted to *1331 return to society ... [and] focuses the jury on the defendant's probable future dangerousness." Ramos, 463 U.S. at 1001-03, 103 S.Ct. at 3454. In that sense, the Briggs Instruction prompted the goal of individualized sentencing because it invited jurors "to predict not so much what some future Governor might do, but more what the defendant himself might do if released into society." Id. at 1005, 103 S.Ct. at 3456. The instruction therefore did not impair the reliability of the sentencing process because it gave jurors "accurate information of which both the defendant and his counsel are aware, and it does not preclude the defendant from offering any evidence or argument regarding the Governor's power to commute a life sentence." Id. (footnote omitted). Furthermore, Louisiana's instruction is an even-handed one which accurately informs jurors that a death sentence as well as a life sentence remains subject to executive revision. As Ramos indicates, the Supreme Court appears satisfied that as long as the information is accurately presented in a manner which does not affirmatively mislead the jury, the Due Process Clause is not offended.
In Simmons v. South Carolina, 512 U.S. 154, 168, 114 S.Ct. 2187, 2196, 129 L.Ed.2d 133 (1994), the Supreme Court reiterated its holding in Ramos, observing that:
... Ramos stands for the broad proposition that we generally will defer to a State's determination as to what a jury should and should not be told about sentencing.... States reasonably may conclude that truthful information regarding the availability of commutation, pardon, and the like, should be kept from the jury in order to provide "greater protection in [the States'] criminal justice system than the Federal Constitution requires." (citing Ramos). Concomitantly, nothing in the Constitution prohibits the prosecution from arguing any truthful information relating to parole or other forms of early release. Simmons, 512 U.S. at 168, 114 S.Ct. at 2196.
Contrary to defendant's assertions, Simmons therefore reaffirmed the broad holding of Ramos in the context of clarifying that if a state decides to make information about commutation and parole an issue in a capital sentencing hearing, it must do so in a fair and accurate manner. In Simmons, the defendant was tried for capital murder in South Carolina, where his prior record rendered him statutorily ineligible for parole if he received a life sentence. The prosecutor argued the defendant's future dangerousness in the penalty phase closing argument, however, and asked for a death verdict as "an act of self defense" on behalf of society. Defense counsel's requests that the jury be instructed about the defendant's parole ineligibility were denied. When the jury sent a note specifically asking about the defendant's parole eligibility, the judge told them that this was not a proper issue for their consideration, and sent them back to deliberate further. Simmons, 512 U.S. at 158-59, 114 S.Ct. at 2191-92.
The Supreme Court observed that the defendant's federal due process rights had been violated because the trial judge's actions "had the effect of creating a false choice between sentencing petitioner to death and sentencing him to a limited period of incarceration." Simmons, 512 U.S. at 161-62, 114 S.Ct. at 2193. At the crux of the matter in Simmons was not whether the federal Constitution prohibited juries from speculating about the future on the basis of accurate sentencing information (a question foreclosed by Ramos), but whether the Due Process Clause would tolerate an argument that, on the one hand, encouraged jurors to return a capital sentence because of the defendant's future dangerousness and that, on the other hand, "conceal[ed] from the sentencing jury the true meaning on its non-capital sentencing alternative, namely, that life imprisonment meant life without parole." Simmons, 512 U.S. at 162, 114 S.Ct. at 2193. The Court concluded:
[I]f the State rests its case for imposing the death penalty at least in part on the premise that the defendant will be dangerous in the future, the fact that the alternative sentence to death is life without parole will necessarily undercut the State's argument regarding the threat the defendant possesses to society. Because truthful information of parole ineligibility allows the *1332 defendant to `deny or explain' the showing of future dangerousness, due process plainly requires that he be allowed to bring it to the jury's attention by way of argument by defense counsel or an instruction from the court.
512 U.S. at 168, 114 S.Ct. at 2196 (Blackmun, J.)
Simmons therefore is a case about fairness and the defendant's due process right to a rebuttal. If the state places the defendant's future dangerousness at issue, then the defendant must be allowed to counteract that claim by informing the jury that there is no hope for his release. The state should not be allowed to restrict the jury's access to relevant sentencing information in a way which creates an unacceptable risk of skewing the sentencing process and rendering the result unreliable. It is not the propriety of the commutation instruction which is at issue in Simmons, but the presentation of accurate sentencing information, which, according to Ramos, is essential to fulfill due process guarantees.
The United States Supreme Court's subsequent decision in Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231, (1985), did not disturb the holding in Ramos. Less than two years after it decided Ramos, the Supreme Court made clear in Caldwell that the state may not diminish the jury's sense of responsibility of its crucial sentencing determination in a capital case by arguing that its verdict is not final and subject to review by a higher court. Caldwell, 472 U.S. at 335-37, 105 S.Ct. at 2643. The Court narrowed the application of Ramos, stating that Ramos did not stand for the broad proposition that states are free to expose capital sentencing juries to any information concerning post-sentencing procedures. The Court nevertheless reaffirmed its basic holding in Ramos regarding the commutation instruction, while distinguishing the prosecutorial remarks made in Caldwell. The Court held that accurate information regarding the governor's commutation power was relevant to sentencing determinations, but that information concerning appellate review "is not linked to any arguably valid sentencing consideration." Caldwell, 472 U.S. at 335, 105 S.Ct. at 2643. Thus, the Court's specific holding regarding the commutation instruction was left untouched.
To support his contention that Ramos is no longer valid, relator also cites a recent circuit court opinion holding that a "modified" Briggs Instruction introduced arbitrary factors into the sentencing determination in violation of the Eighth and Fourteenth Amendments. Hamilton v. Vasquez, 17 F.3d 1149 (9th Cir.1994). The defendant in Hamilton was tried in 1981 before Ramos while the Briggs Instruction was still being given. However, the two-sentence Briggs Instruction upheld in Ramos was inapplicable to Hamilton because, unlike the defendant in Ramos, Hamilton was a twice-convicted felon and was subject to different commutation requirements under California law. Id. at 1163. Consequently, the trial court created a modified Briggs instruction based on proposals from both sides.[6] The resulting *1333 instruction was a lengthy, confusing hodgepodge of information concerning the rules for the commutation of the defendant's sentence. The appellate court found:
This instruction is very different from the two-sentence instruction upheld by the United States Supreme Court in Ramos. That instruction invited no predictions on what the Governor might do. In stark contrast, the instruction in this case so focused on the commutation and parole process that speculation was inevitable, and not only about the Governor, but about the state Supreme Court, and parole officials as well.

Id. at 1162.
The court also noted that, at the time of Hamilton's trial, California law prohibited the defense from showing the actual likelihood of a person ever being paroled if he were sentenced to life imprisonment. The court found that the instruction, as given, incorrectly suggested that if the jury sentenced the defendant to life without parole, he would nevertheless be eligible for parole in as little as seventeen years. Id. at 1162-63. "In short, the modified instruction given in this case did the very thing that the United States Supreme Court in Ramos said the instruction in that case did not do: the instruction in this case created inaccuracies and confusion." Id. at 1163. Clearly, the Hamilton decision is based on its facts, not on a rethinking of the Ramos rationale. As discussed above, subsequent jurisprudential developments in Simmons, Caldwell, and Hamilton have not affected the continued viability of Ramos. Defendant maintains that even under Ramos, La.C.Cr.P. art. 905.2(B) violates federal due process guarantees. Essential to the Ramos holding was the principle that the Briggs Instruction was aimed at accuracy. In particular, it was designed to correct the inaccuracy of the sentence description under California law as "`life imprisonment without possibility of parole'... when, under state law, the Governor possesses authority to commute that sentence to a lesser sentence that includes the possibility of parole." Ramos, 463 U.S. at 1007-11, 103 S.Ct. at 3457-58 (emphasis in original). As the Ninth Circuit observed, "[t]he necessary corollary of that holding ... is that if an instruction is inaccurate or misleading it will not be upheld." Hamilton, 17 F.3d at 1160.
Defendant further contends that the instruction as set forth in La.C.Cr.P. art. 905.2(B) provides the jury with false and misleading information. First, he maintains that the instruction is inaccurate in its statement that the governor has the power to commute sentences because the governor may only commute sentences upon recommendation of the Board of Pardons. La. Const. art. V, § 5(E)(1); Jones, 639 So.2d at 1150. Given that the governor has ultimate decision-making authority regarding clemency, the statement is not wholly inaccurate. California appears to have similar constitutional provisions which did not trouble the Ramos court when it concluded that the Briggs Instruction was an accurate statement of the law. See Hamilton, 17 F.3d at 1162. Thus, the instruction, as written in La.C.Cr.P. art. 905.2(B) is not inaccurate insofar as federal due process is concerned.
Defendant further argues that the commutation instruction is misleading because it creates the false impression that the governor "is out there continually commuting sentences." However, the Ramos court discounted this concern. While the Court acknowledged that "the Briggs Instruction by its terms may incline [the jury's] thoughts to the probability that the current or some future Governor might commute the defendant's sentence," Ramos, 463 U.S. at 1002 n. 17, 103 S.Ct. at 3454 n. 17, the Court emphasized that this instruction was not misleading. Ramos, 463 U.S. at 1004 n. 19, 103 S.Ct. at 3455 n. 19. "The Briggs Instruction gives the jury accurate information of which both the defendant and his counsel are aware, and it does not preclude the defendant from offering any evidence or argument regarding the Governor's power to commute a life sentence." Ramos, 463 U.S. at 1004, 103 S.Ct. at 3455. In the instant case, the instruction gives an accurate statement of the law and affords the defendant the opportunity to present evidence concerning the frequency and extent of the use of this power. Thus, the danger that any mischaracterization of the governor's power *1334 may occur are minimized by the defense's right to present such evidence.
Defendant further observes that unlike the Briggs Instruction in Ramos, Louisiana's law expressly refers to the governor's power to commute a death sentence. He argues that this additional statement renders the instruction unconstitutional under Ramos. Although this evenhandedness would appear to make the instruction more fair and accurate, as defendant points out, Ramos suggests that mentioning the power to commute death sentences may create, not solve, constitutional problems by lessening the jury's sense of responsibility for making its critical sentencing determination. Ramos, 463 U.S. at 1011-13, 103 S.Ct. at 3459. Nevertheless, the Ramos court explicitly stated that the federal Constitution does not prohibit an instruction regarding the governor's power to commute a death sentence. Id. 463 U.S. at 1012 n. 27, 103 S.Ct. at 3459 n. 27. Therefore, informing the jury that the governor may commute a death sentence, as well as a sentence of life imprisonment, does not violate the Due Process Clause according to Ramos.
Finally, relator argues that if the defense does adduce statistical information regarding the number of commutations, it will further add to racial discrimination in the administration of the death penalty. He points out the black males are the most frequent recipients of commutations. Therefore, juries will be incited to impose harsher punishments on black defendants to compensate for use of the commutation power in their favor.
Nonetheless, as defendant himself observes, these racial considerations are irrelevant to the jury's sentencing determination and it is axiomatic that it is unconstitutional to predicate a sentence on the race of the accused. Cf. McCleskey v. Kemp, 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987). Given the admitted irrelevancy of this racial information, certainly this evidence will not be permitted. While the defendant may present evidence concerning the frequency and extent of the use of executive clemency, La.C.Cr.P. art. 905.2(B) does not provide for the introduction of prejudicial information about the racial background of those defendants who have received commutations. Hence, under Ramos, the brief, neutrally-worded instruction in Art. 905.2(B), like the Briggs instruction, does not implicate federal due process concerns. The instant instruction does not invite the kind of speculation or result in the same degree of confusion as the lengthy, detailed instruction in Hamilton.

C. La.C.Cr.P. art. 905.2(B) does not violate the Louisiana Constitution by exceeding the parameters established by La. Const. art. I, § 16
Defendant argues that the reenacted version of La.C.Cr.P. art. 905.2(B) exceeds the scope of the authorization in the constitutional amendment. La. Const. art. I, § 16, as amended, states:
Every person charged with a crime is presumed innocent until proven guilty and is entitled to a speedy, public, and impartial trial in the parish where the offense or an element of the offense occurred, unless venue is changed in accordance with law. No person shall be compelled to give evidence against himself. An accused is entitled to confront and cross-examine the witnesses against him, to compel the attendance of witnesses, to present a defense, and to testify in his own behalf. However, nothing in this Section or any other section of this constitution shall prohibit the legislature from enacting a law to require a trial court to instruct a jury in a criminal trial that the governor is empowered to grant a reprieve, pardon, or commutation of sentence following conviction of a crime, that the governor in exercising such authority may commute or modify a sentence of life imprisonment without benefit of parole to a lesser sentence which includes the possibility of parole, may commute a sentence of death to a lesser sentence of life imprisonment without benefit of parole, or may allow the release of an offender either by reducing a life imprisonment or death sentence to the time already served by the offender or by granting the offender a pardon. 1995 La. Acts No. 1322 (emphasis added to denote amendment). *1335 Relator notes that the amendment authorizes the delivery of the commutation instruction and nothing more. However, the last sentence of La.C.Cr.P. art. 905.2(B) provides that "[t]he defense may argue or present evidence to the jury on the frequency and extent of use by the governor of his authority." Given the absence of constitutional language allowing the introduction of such evidence, relator argues that introduction of the evidence is prohibited. Because there is no constitutional basis for the article as enacted, relator contends that La.C.Cr.P. art. 905.2(B) is unconstitutional.[7]
Whether the Louisiana Constitution provides for the introduction of such evidence is irrelevant given that federal jurisprudence mandates the introduction of such evidence. The United States Supreme Court has held that the Due Process Clause does not allow the execution of a person "on the basis of information which he had no opportunity to deny or explain." Gardner v. Florida, 430 U.S. 349, 361, 97 S.Ct. 1197, 1207, 51 L.Ed.2d 393 (1977). As a result, the Ramos court noted favorably that the Briggs Instruction does not preclude the defendant from offering any evidence or argument regarding the governor's power to commute a life sentence. Ramos, 463 U.S. at 1003-05, 103 S.Ct. at 3455. Later, the Court held that such an opportunity "to deny or explain" was required by due process when the jury could reasonably have believed that a defendant might be released if he were not executed. In Simmons, the Court held that the jury should have been informed that a life sentence did not include the possibility of parole so that the jury would not be presented with a "false choice" between death or imprisonment for a number of years. Simmons, 512 U.S. at 161, 114 S.Ct. at 2193. To prevent this false choice from being presented to the jury, it is necessary that the defendant should be allowed to present evidence concerning the commutation power "to deny or explain" the frequency and extent of the use of this gubernatorial power. It would be violative of due process to prevent a defendant from offering evidence concerning the governor's commutation power. Therefore, whether the last sentence of Art. 905.2(B) was specifically authorized by the Louisiana Constitution is irrelevant given the federal mandate that it be included.

D. La.C.Cr.P. art. 905.2(B) does not violate the separation of powers under the Louisiana Constitution
Next, relator argues that La.C.Cr.P. art. 905.2(B) violates the separation of powers under the Louisiana Constitution by unduly burdening the office of the governor. He asserts that this legislative enactment creates a federal right to call the governor to testify, which therefore impinges on this state's separation of powers doctrine. He asserts that the last sentence of the article has two effects: first, the governor will be forced to disclose his privileged rationale for granting or denying clemency, and second, by requiring the governor to testify at trials, the legislature has made his job practically impossible. See, Jones, 639 So.2d at 1153.
Despite relator's insistence that the governor testify at his penalty phase hearing and his dire predictions regarding legislative interference with the Governor's duties, both state and federal jurisprudence indicate that La.C.Cr.P. art. 905.2(B) does not require the governor to testify concerning his standards for granting or denying clemency, but in fact, prohibit it.
First, the language in La.C.Cr.P. art. 905.2(B) prescribing the type of evidence that may be introduced by the defense is narrowly *1336 drawn and clearly does not permit testimony by the governor. The last sentence of La.C.Cr.P. art. 905.2(B) provides that "[t]he defense may argue or present evidence to the jury on the frequency and extent of use by the governor of his authority." (emphasis added). The terms "frequency and extent" do not appear to allow evidence concerning the governor's rationale behind his use of pardon power. The word "frequency" may reasonably be interpreted to mean "how often," which would entail a description of the number of pardons and commutations since the death penalty was reinstituted. The term "extent" may reasonably be interpreted to mean "to what degree" offenders are pardoned or their sentences are commuted. For example, to demonstrate the extent of the governor's power, defense evidence could describe how the governor commuted a life sentence to a term of years, relating the new length of the commuted sentence. According to the article these two types of evidence are the only ones authorized, and obviously, neither term refers to the governor's rationale behind the granting or denial of clemency. Thus, the burdens on the executive branch forecast by relator will not materialize.
Second, both state and federal jurisprudence prohibit delving into the details of the procedure by which executive clemency is granted, a process that is "shrouded in mystery and often fraught with arbitrariness." Jones, 639 So.2d at 1150. Presenting evidence regarding the governor's decision-making process would only serve to invite speculation as to the governor's future actions, compromising the defendant's due process rights. Such speculation would surely introduce an arbitrary factor into an otherwise straightforward discussion of executive clemency, resulting in a denial of due process rights. See Ramos, 463 U.S. at 1002-07, 103 S.Ct. at 3455-56; Jones, 639 So.2d at 1153. Nevertheless, the Ramos court noted approvingly that the defendant there was allowed to "offer evidence or argument regarding the commutation power" and that the defense, in fact, "addressed the possibility of the Governor's commutation of a life sentence in his closing argument." Ramos, 463 U.S. at 1004 n. 19, 103 S.Ct. at 3455 n. 19. The Court also noted that the introduction of accurate information concerning the likelihood of commutation precludes the type of speculation that could thwart due process guarantees. Id. at 1003-05, 103 S.Ct. at 3455. However, the Court disapproved of instructions which would invite the jury to speculate as to what a future governor might do. Id. at 3456.

CONCLUSION
For the foregoing reasons, we hold that La.C.Cr.P. art. 905.2(B) does not violate the Federal or State Ex Post Facto Clauses. We further find that La.C.Cr.P. art. 905.2(B) does not violate the Eighth Amendment prohibition of the use of mitigating evidence as an aggravating circumstance or the Due Process Clause. Accordingly, we affirm the decision of the court of appeal.
AFFIRMED.
LEMMON, J., subscribes to the opinion and assigns additional reasons.
LEMMON, Justice, assigning additional concurring reasons.
The pertinent instruction, which is a concise and accurate statement of the law, does not alone interject an arbitrary factor into the sentencing proceeding and therefore does not by itself violate due process. See California v. Ramos, 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983). However, the instruction very well may lead to due process violations if the prosecutor, by evidence or argument, ventures into the possible consequences of commutation, or if the prosecutor and defense counsel overemphasize the issue to such an extent that the jury's attention is diverted from its function of determining the sentence based on the circumstances of the murder and the character and propensities of the murderer.
NOTES
[*] Pursuant to Rule IV, Part 2, Section 3, J. Bleich was not on panel. The panel consisted of Justice Johnson, Chief Justice Calogero, and Justices Kimball, Lemmon, Marcus, Victory and Watson.
[1] La. Const. art. I, § 16, as amended, states:

Every person charged with a crime is presumed innocent until proven guilty and is entitled to a speedy, public, and impartial trial in the parish where the offense or an element of the offense occurred, unless venue is changed in accordance with law. No person shall be compelled to give evidence against himself. An accused is entitled to confront and cross-examine the witnesses against him, to compel the attendance of witnesses, to present a defense, and to testify in his own behalf. However, nothing in this Section or any other section of this constitution shall prohibit the legislature from enacting a law to require a trial court to instruct a jury in a criminal trial that the governor is empowered to grant a reprieve, pardon, or commutation of sentence following conviction of a crime, that the governor in exercising such authority may commute or modify a sentence of life imprisonment without benefit of parole to a lesser sentence which includes the possibility of parole, may commute a sentence of death to a lesser sentence of life imprisonment without benefit of parole, or may allow the release of an offender either by reducing a life imprisonment or death sentence to the time already served by the offender or by granting the offender a pardon.
(emphasis added to denote amendment).
[2] As the Court noted, Beazell omits a fourth category of ex post facto laws mentioned in Calder: laws that alter the legal rules of evidence, and require less or different testimony than the law required at the time of the commission of the offense to convict the offender. However, there appears to be some question whether this test is still valid. Collins, 497 U.S. at 42 n. 3, 110 S.Ct. at 2719 n. 3. Since this category is obviously inapplicable to the instant case, the continued viability of this category will not be discussed.
[3] In an earlier summary of the jurisprudence regarding the Ex Post Facto Clause, this Court stated that there are five categories in which laws are considered to be a prohibited ex post facto application. State v. Sepulvado, 342 So.2d 630, 635 (La.1977). A law is ex post facto if it falls under one of the four categories in Calder, supra, or the fifth category, as stated in Kring, i.e, those laws enacted after the offense was committed and which alters the situation of the accused to his disadvantage. While the U.S. Supreme Court has eliminated the Kring test for ex post facto laws as inconsistent with Calder and its progeny, this Court has not eliminated the Kring criteria as an independent category under which laws can be found to have an impermissible retroactive application.
[4] In State v. Jones, 94-0459 (La.7/5/94), 639 So.2d 1144, this Court struck down the original version of La.C.Cr.P. art. 905.2(B) under art. I, §§ 2 and 20 (the Due Process and Inhumane Treatment Clauses) of the Louisiana constitution. The majority's opinion in Jones relied on principles of state constitutional law only, because the Supreme Court had ruled in Ramos, 463 U.S. at 1013, 103 S.Ct. at 3460, that the United States constitution does not prevent states from enacting such laws. Jones, 639 So.2d at 1155. Since the Jones decision was handed down, however, the state constitution has been amended to allow for such a provision. See, 1995 La. Acts No. 1322. Concurrent with the adoption of this constitutional amendment, La.C.Cr.P. art. 905.2(B) has been reintroduced and is now law. See, 1995 La. Acts No. 551. Thus, the recent amendment of La. Const. art I § 16 has all but overruled Jones rendering the Lindsey rule and its progeny all but extinct. There is no longer any state constitutional basis for holding La.C.Cr.P. art. 905.2(B) invalid.
[5] Unlike the instruction in the present case, the charge made no mention of the governor's power to commute a sentence of death.
[6] The instruction began with the standard, two-sentence Briggs instruction, then added the following:

This is subject to the requirement that, in the case of any person twice convicted of a felony, a commutation or modification may not be granted absent the written recommendation of at least four justices of the California Supreme Court. Further, a life sentence requires a minimum incarceration of 25 years less one-third off for good time credits before parole may be considered by the proper authorities. You are now instructed, however, that the matter of a possible commutation or modification of sentence is not to be considered by you in determining the punishment for Mr. Hamilton. You must not speculate as to whether such commutation or modification would ever occur. It is not your function to decide now whether this man will be suitable for parole at some future date. So far as you are concerned, you are to decide only whether this man shall suffer the death penalty or whether he shall be permitted to remain alive. If upon consideration of the evidence you believe that life imprisonment without possibility of parole is the proper sentence, you must assume that the Governor, the Supreme Court, and those officials charged with the operation of our parole system will perform their duty in a correct and responsible manner, and that Mr. Hamilton will not be paroled unless he can safely be released into society. It would be a violation of your duty as jurors if you were to fix the penalty at death because of a doubt that the Governor and other officials will properly carry out their responsibilities.
Hamilton, 17 F.3d at 1161-62.
[7] Even if this Court were to find that the last sentence of the article did exceed the scope of the authorizing amendment, the constitutionality of the instruction would not be affected. The unconstitutionality of one portion of a statute does not necessarily render the entire statute unenforceable. If the remaining portion of the statute is severable from the offending portion, this Court may strike only the offending portion and leave the remainder intact. State v. Williams, 400 So.2d 575 (La.1981). The test for severability is whether the unconstitutional portions of the statute are so interrelated and connected with the constitutional parts that they cannot be separated without destroying the intention manifested by the legislature in passing the act. State v. Azar, 539 So.2d 1222 (La.1989). The last sentence is unnecessary to the meaning and efficacy of the preceding part of the article. Thus, if it were offensive, the offending portion could be stricken without affecting the constitutionality of the instruction as a whole.